# United States Court of Appeals
# For the First Circuit

---

EMIGRANT RESIDENTIAL, LLC,

Plaintiff-Appellee,

v.

LINDA S. PINTI,

Defendant-Appellant,

LESLEY R. PHILLIPS; AND ANY AND ALL
OCCUPANTS,

Defendants.

---

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
CASE NO. 1:19-cv-12258-DJC
JUDGE DENISE J. CASPER

## OPENING BRIEF FOR DEFENDANT-APPELLANT
## LINDA S. PINTI

Eric E. Renner (CA1# 1136562)
Duffy & Sweeney, Ltd.
321 South Main Street, Suite 400
Providence, RI 02903
Phone: 401-455-0700
Fax: 401-455-0701
erenner@duffysweeney.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... i

REASONS THAT ORAL ARGUMENT SHOULD BE HEARD ........................ iii

TABLE OF AUTHORITIES ................................................................ iv

PRELIMINARY STATEMENT ............................................................ 1

JURISDICTIONAL STATEMENT ....................................................... 3

STATEMENT OF ISSUES ................................................................. 4

STATEMENT OF THE CASE ............................................................. 5

   I.  Factual Background ................................................................. 5

   II. District Court Proceedings ...................................................... 14

STATEMENT OF RELATED CASES AND PROCEEDINGS .......................... 19

STANDARD OF REVIEW ................................................................ 19

SUMMARY OF ARGUMENT ............................................................ 21

ARGUMENT.................................................................................. 22

I.      Emigrant's MSJ, Assessed Under the Proper Standard, Failed to
       Show the Absence of Genuine Issues of Material Fact as to
       Whether Emigrant is the Current Owner of the Pinti Mortgage
       and Has Standing to Strike the Discharge .............................. 22

II.     Emigrant's MSJ, Assessed Under the Proper Standard, Failed to
       Show the Absence of Genuine Issues of Material Fact as to
       Whether the Pinti Mortgage Was Discharged by Mistake ...................... 32

      A.    The District Court Erred in Relying on the Marcano
           Affidavit ............................................................... 33

      B.    The District Court Erred in Crediting Marcano's Version
           of Events Over Sorvillo's ...................................... 38

      C.    EMC or Emigrant Returning the Pinti Note Was Not
           Required for a Valid Discharge of the Pinti Mortgage ............ 39

III.  Emigrant's MSJ, Assessed Under the Proper Standard,
      Failed to Show the Absence of Genuine Issues of Material
      Fact as to Whether (1) Emigrant Was Entitled to Equitable
      Relief Given Its Misconduct and Unclean Hands and (2)
      Pinti can be Restored to Her Status Quo Position....................................39

IV.   The District Court Erred in Dismissing Pinti's c. 93A Claim
      on Statute of Limitations Grounds ...........................................................47

CONCLUSION ................................................................................................49

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

## REASONS THAT ORAL ARGUMENT SHOULD BE HEARD

This case involves important questions of (1) non-mortgagee standing to seek to strike a mortgage discharge; (2) litigants' burden of proof when seeking to set aside a mortgage discharge based on mistake; (3) the district court's obligation to undertake a balancing analysis of the parties' respective equities when deciding whether or not to grant equitable relief; and (4) application of statutes of limitations and the discovery rule and recoupment/setoff.  Oral argument will aid this Court's decisional process.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ahmed v. Johnson*,
752 F.3d 490 (1st Cir. 2014) ........................................................38, 39

*Alison H. v. Byard*,
163 F.3d 2 (1st Cir. 1998) ....................................................................20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) .............................20

*Barcelos v. Deutsche Bank Nat'l Tr. Co.*,
86 Mass. App. Ct. 1102, 10 N.E.3d 1145 (2014)..................................23

*Bolduc v. Beal Bank, SSB*,
167 F.3d 667 (1st Cir. 1999) ...............................................................48

*Bose Corp. v. Consumers Union of U.S., Inc.*,
367 Mass. 424, 326 N.E.2d 8 (Mass. 1975).........................................48

*Bull v. United States*,
295 U.S. 247, 55 S. Ct. 695, 79 L. Ed. 1421, 81 Ct. Cl. 974, 1935-1 C.B. 310
(1935) ...................................................................................................49

*Burns v. Johnson*,
829 F.3d 1 (1st Cir. 2016) ....................................................................20

*Charbonnages de France v. Smith*,
597 F.2d 406 (4th Cir. 1979)................................................................20

*Charette v. Gelinas*,
88 Mass. App. Ct. 1117 (2015) ...........................................................42

*Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*,
773 F.3d 110 (2d Cir. 2014).................................................................24

*Childs v. Stoddard*,
130 Mass. 110 (1881) ....................................................................40, 41

iv

*Coyne v. Taber Partners I*,
53 F.3d 454 (1st Cir. 1995) ..................................................................21

*Culhane v. Aurora Loan Servs. of Nebraska*,
708 F.3d 282 (1st Cir. 2013) ..........................................................23, 29

*Deniz v. Municipality of Guaynabo*,
285 F.3d 142 (1st Cir. 2002)…………………………………………………29

*Deutsche Bank Natl. Trust Co. v Elshiekh*,
179 A.D.3d 1017, 118 N.Y.S.3d 183 (App. Div. 2020).........................37

*E. Bos. Sav. Bank v. Ogan*,
428 Mass. 327, 701 N.E.2d 331 (1998) ................................................40

*Eaton v. Fed. Nat. Mortg. Ass'n*,
462 Mass. 569, 969 N.E.2d 1118 (2012) .................. 22, 23, 25, 30, 31

*Edwards v. Consol. Rail Corp*.,
567 F. Supp. 1087 (D.D.C. 1983) .........................................................21

*Emigrant Mortgage Company, Inc. v. Pinti et al*.,
16-cv-11136-MLW (D. Mass. Jan. 17, 2019)........................................12

*Escribano-Reyes v. Prof'l HEPA Certificate Corp*.,
817 F.3d 380 (1st Cir. 2016) ................................................................38

*Farrell Constr. Co. v. Jefferson Parish, La*.,
896 F.2d 136 (5th Cir.1990)..................................................................32

*Fidelity Mgmt. & Research Co. v. Ostrander*,
40 Mass. App. Ct. 195, 662 N.E.2d 699 (1996).....................................41

*Frankowich v. Szczuka*,
321 Mass. 75, 71 N.E.2d 761 (1947).....................................................24

*Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC*,
16 F.4th 304, (1st Cir. 2021) .................................................................24

*Howard v. Wal-Mart Stores, Inc.*,
160 F.3d 358 (7th Cir. 1998) ...............................................................35

*Iverson v. City of Boston*,
452 F.3d 94 (1st Cir. 2006) ..................................................................20

*Lambert v. Fleet Nat'l. Bank*,
449 Mass. 119, 865 N.E.2d 1091 (Mass. 2007) .....................................48

*Lamson & Co. v. Abrams,*
305 Mass. 238 (1940) ...........................................................................24

*Less v. Berkshire Hous. Ser.*,
No. 00-30033-MAP, 2000 WL 1615740 (D. Mass. Sept. 8, 2000) .........46

*Lopes v. JetSetDC, LLC*,
994 F.Supp.2d 126 (D.D.C.2014) ..........................................................32

*Manufacturers' Fin. Co. v. McKey*,
294 U.S. 442 (1935) ..............................................................................42

*May v. SunTrust Mortg., Inc.*,
467 Mass. 756, 7 N.E.3d 1036 (2014) ...................................................48

*N. L. R. B. v. Smith Indus., Inc.*,
403 F.2d 889 (5th Cir. 1968) .................................................................21

*NationsBanc Mortg. Corp. v. Eisenhauer*,
49 Mass. App. Ct. 727, 733 N.E.2d 557 (2000) ...................... 1, 32, 37, 39

*New England Merchants Nat. Bank of Boston v. Kann*,
363 Mass. 425 (1973) ...........................................................................42

*Nichols v. Cadle Co.*,
139 F.3d 59 (1st Cir.1998) .....................................................................25

*Nicolo v. Phillip Morris, Inc.*,
201 F.3d 29 (1st Cir. 2000) ....................................................................20

*North Easton Coop. Bank v. MacLean*,
300 Mass. 285, 15 N.E.2d 241 (1938) ................................................40

*Perez v. Volvo Car Corp.*,
247 F.3d 303 (1st Cir. 2001) ................................................35

*Pinti v. Emigrant Mortg. Co., Inc.*,
472 Mass. 226 (2015) ................................................12

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*,
324 U.S. 806 (1945)................................................43, 44

*Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.*,
620 F.2d 1 (1st Cir.1980) ................................................31, 32

*Provident Co-operative Bank v. James Talcott, Inc.*,
358 Mass. 180, 260 N.E.2d 903 (1970)................................................29, 42

*Puleio v. Vose*,
830 F.2d 1197 (1st Cir.1987) ................................................41

*Ramirez v. Collier*,
595 U.S. 411, 142 S. Ct. 1264, 212 L. Ed. 2d 262 (2022) ................................................42

*Sullivan v. Hudgins*,
303 Mass. 442, 22 N.E.2d 43 (1939)................................................24

*Sylvania Elec. Prod., Inc. v. Flanagan*,
352 F.2d 1005 (1st Cir. 1965)……………………………………………………..36

*Texaco P.R., Inc. v. Dep't of Consumer Affs.*,
60 F.3d 867 (1st Cir. 1995) ................................................2, 19, 40, 43

*U.S. Bank Nat. Ass'n v. Ibanez*,
458 Mass. 637, 941 N.E.2d 40 (2011)................................................22, 23, 24, 25, 28, 29, 30, 31

*US Bank Nat. Ass'n v. Twomey*,
No. MICV200905070F, 2012 WL 2335295 (Mass. Super. May 23, 2012) .....28, 29

*U.S. Olympic Comm. v. Intelicense Corp., S.A.*,
737 F.2d 263 (2d Cir. 1984)……………………………………………………29

*United Fruit Co. v. United States*,
186 F.2d 890 (1st Cir. 1951) ...............................................................47

*United States v. 15 Bosworth St.*,
236 F.3d 50 (1st Cir. 2001) ...............................................................35

*United States v. Perez-Torres,*
15 F.3d 403 (5th Cir. 1994)................................................................41

*United States v. Rodríguez,*
162 F.3d 135 (1st Cir. 1998) ..............................................................33

*United States v. Singer Mfg. Co.*,
374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963) ............................19

*United Structures of America, Inc. v. G.R.G. Eng'g, S.E.*,
9 F.3d 996 (1st Cir. 1993) ..................................................................49

*Wallace Motor Sales, Inc. v. Am. Motor Sales Corp.*,
780 F.2d 1049 (1st Cir. 1985) .............................................................36

*Wells Fargo Bank v. Nat'l Lumber Co.*,
76 Mass. App. Ct. 1, 918 N.E.2d 835 (2009) ...................................2, 42

*Wilson v. HSBC Mortg. Servs.*,
744 F.3d 1, (1st Cir. 2014) .................................................................23

**Statutes**

18 U.S.C. § 1332.................................................................................3

28 U.S.C. § 1291.................................................................................4

**Rules**

Fed. R. App. P. 4(a) ...........................................................................4

Fed. R. Civ. P. 17(a) ................................................................... 1, 31, 32

Fed. R. Civ. P. 17(a) advisory committee note 1966………………………...…32

Fed. R. Civ. P. 56 advisory committee note 2010...................................37

Fed. R. Civ. P. 56(c) ...................................................................20

Fed. R. Civ. P. 56(c)(1)(A) ...........................................................37

Fed. R. Evid. 602 .......................................................................33

Fed. R. Evid. 803(6)................................................................36, 37

Fed. R. Evid. § 1002………………………………………………………………36

Mass. Gen. L. c. 93A ..............................................................47, 48

M.G.L. c. 106, § 1-201(14) ...........................................................27

M.G.L. c. 183, § 3......................................................................30

## Other Authorities

1 Anderson U.C.C. §§ 1-201:199, 1-201:200, 1-201:202, 1-201:265 ...................27

6A Charles Alan Wright et al. Federal Practice and Procedure § 1543 (3rd ed. 2010) ....................................................................................32

30A C.J.S. Equity § 43..................................................................45

30A C.J.S. Equity § 102................................................................42

30A C.J.S. Equity § 107................................................................43

59 C.J.S. Mortgages § 720 .............................................................24

7 Corbin on Contracts § 28.37 (2021) ...............................................47

ix

## PRELIMINARY STATEMENT

After two prior lawsuits with appellee Emigrant Residential LLC's ("Emigrant") agent, Emigrant Mortgage Company, Inc. ("EMC"), were resolved in appellant Linda S. Pinti's ("Pinti") favor, Emigrant filed a third now claiming to be the proper party and asking the district court to invoke its equity powers to undo what it claims was a mistaken discharge of the subject Pinti Mortgage made by EMC. As the party seeking to change the status quo, it is Emigrant's burden to show by "full, clear, and decisive proof" that EMC issued the mortgage discharge by mistake. *NationsBanc Mortg. Corp. v. Eisenhauer*, 49 Mass. App. Ct. 727, 730, 733 N.E.2d 557, 560 (2000). The district court erred for four general reasons.

***First***, Emigrant was not the mortgagee when it commenced this lawsuit in 2019 (nor is it the mortgagee now) because it was not the owner of the Pinti Mortgage, and thus lacks standing and is not a real party in interest under Fed. R. Civ. P. 17(a). Emigrant's predecessor, ESB-MH Holdings, LLC ("ESB-MH"), transferred the Pinti Note and Pinti Mortgage to the Federal Home Loan Bank of New York ("FHLBNY") no later than November 2009 when ESB-MH pledged and assigned the Pinti Mortgage to FHLBNY. FHLBNY remained the owner of the Pinti Mortgage unless and until assigned in writing to Emigrant. When FHLBNY attempted to assign the Pinti Mortgage back to Emigrant in 2019, the Pinti Mortgage

1

had been discharged, and thus the attempted assignment was void because FHLBNY had nothing to assign. FHLBNY is the entity with standing, not Emigrant.

***Second***, rather than viewing the summary judgment record and the reasonable inferences therefrom regarding Emigrant's alleged mistaken discharge in the light most favorable to Pinti, the district court credited Emigrant's version of the record over Pinti's and made factual determinations and inferences in Emigrant's favor. In so doing, the district court relied on an inadmissible affidavit from EMC's assistant treasurer, Joel Marcano ("Marcano") ("Marcano Affidavit") and disregarded conflicting testimony from another EMC employee, Anna Sorvillo ("Sorvillo").

***Third***, before even reaching the merits of Emigrant's claim that the discharge was prepared by mistake, the district court should have recognized that, when ruling in equity, it was required to balance the equities to consider the conduct and potential hardships of both parties involved in a case, resolving all disputed factual questions material to the balancing of equities in Pinti's favor on summary judgment. *See Texaco P.R., Inc. v. Dep't of Consumer Affs.,* 60 F.3d 867, 878 (1st Cir. 1995); *Wells Fargo Bank v. Nat'l Lumber Co*., 76 Mass. App. Ct. 1, 6, 918 N.E.2d 835, 840 (2009). The district court acted as a fact finder, failed to balance the parties' respective equities and took an overly myopic view of the misconduct underpinning the unclean hands analysis, which is but one maxim of equity relevant to the balancing of equities, by looking only at Emigrant and EMC's conduct in sending

2

the mortgage discharge, as opposed to Emigrant and EMC's entire body of malfeasance in relation to the discharge and the resulting harm caused to Pinti. The district court also abused its discretion and erred when it found—on summary judgment—that Pinti could be restored to her status quo position even though she stands to lose, among other things, the significant equity in her house built up over the years since Emigrant issued the discharge where Emigrant has stated its intent to pursue hundreds of thousands of dollars in attorney's fees and interest accrued over that time. In the light most favorable to Pinti, Emigrant's behavior and Pinti's harm negates Emigrant's entitlement to the equitable relief of setting aside the discharge.

*Fourth*, in dismissing Pinti's counterclaim for unfair and deceptive business practices in violation of Mass. Gen. L. c. 93A based on statute of limitations grounds, the district court erred by failing to consider that the statute of limitations was tolled by the discovery rule since Pinti only discovered Emigrant's wrongful conduct because of the January 11, 2019 ruling in the Pinti II case. The district court also erred by failing to acknowledge that—regardless of whether the statute of limitations may have passed (it did not)—Pinti can bring her c. 93A claim *defensively* in recoupment and/or setoff in response to Emigrant's claim.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 1332 because the parties are completely diverse in citizenship and the amount in controversy exceeds

$75,000. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's decision was a final decision and this appeal is from a final order of the district court that disposed of all the parties' claims. On March 29, 2024, the district court entered judgment for Emigrant. Addendum ("ADD") ADD036. In accordance with Fed. R. App. P. 4(a), Pinti timely noticed her appeal on April 22, 2024. Joint Appendix ("JA") JA02555.

## STATEMENT OF THE ISSUES

The issues on appeal are whether the district court erred when it: (1) found that as a matter of law Emigrant is the owner of the Pinti Mortgage and has standing to seek to strike the discharge even though when FHLBNY attempted to assign the Pinti Mortgage to Emigrant in 2019, the Pinti Mortgage had been discharged, and thus the attempted assignment was void because FHLBNY had nothing to assign; (2) found that as a matter of law the Pinti Mortgage was discharged by mistake; (3) when granting Emigrant the equitable relief of setting aside the discharge, acted as a fact finder, failed to balance the parties' equities and found as a matter of law that Emigrant was entitled to equitable relief despite its misconduct and that Pinti can be restored to her status quo position; and (4) dismissed Pinti's c. 93A counterclaim on statute of limitations grounds without considering the discovery rule and recoupment/setoff.

4

# STATEMENT OF THE CASE

## I.      Factual Background

In August 1982, Lesley R. Phillips ("Phillips") purchased a condominium as her primary residence located at 1643 Cambridge St, Unit 52, Cambridge, MA 02138 ("Property") and assumed a preexisting mortgage with a remaining balance of roughly $40,000. JA01153 ¶ 2; JA02086. Pinti, who was Phillips' spouse, lived with Phillips at the Property continuously since 1989 and was added to the deed in 2005.[1] JA01153 ¶ 3; JA02086.

In December 1999, FHLBNY and Emigrant's parent, Emigrant Savings Bank n/k/a Emigrant Bank ("Emigrant Bank"), entered into an Advances, Collateral Pledge and Security Agreement ("Advances Agreement"). JA02153 ¶ 79; JA02087. Under the plain terms of the Advances Agreement, Emigrant Bank *assigned, transferred, and pledged* to FHLBNY all Mortgage Collateral (including Mortgage Documents) and Other Collateral now or hereafter owned by Emigrant Bank, which included mortgages and promissory notes and all endorsements and assignments thereof. JA02156 ¶ 80; JA02087  The Advances Agreement contains a host of terms governing FHLBNY's rights and Emigrant Bank's obligations with respect to the pledged Mortgage Collateral. JA02153-JA02163 ¶¶ 81-88; JA02087-JA02089.

---

[1] Phillips passed away prior this appeal and Pinti filed a Suggestion of Death with the district court on April 22, 2024. JA02553. As a result, Pinti is the sole Appellant.

On March 13, 2008, Pinti executed and delivered a promissory note to EMC for $160,000.000 ("Pinti Note") as part of a refinance of a 2005 home equity loan. JA01153 ¶ 1; JA00727. On that same date, Pinti and Phillips provided a mortgage ("Pinti Mortgage") on the Property to EMC to secure the Pinti Note and recorded it with the Middlesex County (Southern District) Registry of Deeds ("Registry"). JA01156 ¶ 3. Prior to the 2005 home equity loan refinanced with EMC, Phillips' original 1982 mortgage was within one month of being paid off. JA01153 ¶ 2.

On April 7, 2008—about one month after Pinti executed the Pinti Note and Pinti Mortgage—ESB-MH, Emigrant Bank, and FHLBNY executed a Subsidiary/Affiliate Collateral Pledge and Security Agreement ("Pledge Agreement"). JA02089 ¶ 89; JA02209. Under the Pledge Agreement, ESB-MH (as Pledgor) *assigned, transferred*, *and pledged* to FHLBNY the notes and mortgages listed in Attachment, i.e., the Pledgor Collateral. JA02089 ¶ 90; JA02209-JA02210. The Pledgor Collateral constituted Collateral for all purposes under the Advances Agreement and FHLBNY has the same rights to the Pledgor Collateral as it does to the Collateral in the Advances Agreement. JA02090 ¶ 91; JA02209-JA02210; JA02177; JA02223; JA02227. For example, ESB-MH was required to deliver the Pledgor Collateral to FHLBNY upon demand. JA02090 ¶ 92; JA02211.

Roughly a year and a half after the mortgage loan with EMC, in August 2009, Pinti and Phillips suffered financial hardship and defaulted on the Pinti Note by

failing to timely make payment. JA01156 ¶ 4; JA01148 ¶ 5. They reached out and tried to work with EMC to find a solution, and pursued other solutions, but EMC was not willing to help. JA01148 ¶¶ 6-8. Pinti and Phillips, however, continued to pay taxes, insurance, and condominium fees. JA01151-JA01152 ¶¶ 27-28; JA01156. ¶ 4. EMC sent Pinti and Phillips a 90-day notice of right to cure on September 29, 2009. JA01156 ¶ 5.

In an August 4, 2009 letter, FHLBNY demanded that ESB-MH deliver the Pledgor Collateral to FHLBNY. JA02091 ¶ 97; JA02266. Specifically, FHLBNY advised that it was moving Emigrant Bank and its subsidiaries and affiliates (including ESB-MH) to the "Listing & Segregation II" collateral category for all of Emigrant Bank and its affiliates' pledged Mortgage Collateral and that this change was effective immediately, but that the process was to be completed within ninety days or October 30, 2009. JA02091 ¶ 98; JA02266. The August 4, 2009 letter referred Emigrant Bank to FHLBNY's Member Product Guide and attached a Delivery of Mortgage Collateral Procedures document and specified that individual mortgage assignments would be required for the delivery of mortgage collateral. JA02091 ¶¶ 99-100; JA02266-JA02267. Because Emigrant Bank and its subsidiaries and affiliates (including ESB-MH) were assigned to Listing & Segregation II status, they were required to (i) endorse each promissory note in blank and (ii) prepare mortgage assignments to FHLBNY in recordable form as required

by the recording district. JA02092 ¶ 101; JA02266; JA02157; JA02211; JA02291.

They were also required to stamp the outer front cover of the loan file with "The

Note and Mortgage Relating to this Loan Have Been Assigned to the Federal Home

Loan Bank of New York." JA02092 ¶ 102; JA02157. They were then required to

maintain the loan files in a segregated vault or storage area with signage marked

"Federal Home Loan Bank of New York." JA02092 ¶ 103; JA02157; JA02266;

JA02291.

As of August 2009, Emigrant Bank was borrowing money from FHLBNY

and ESB-MH intended to comply with these obligations. JA02092 ¶ 104; JA02182;

JA02226; JA02227; JA02232. Once in the "Listing & Segregation II" collateral

category, by the terms of the Advances Agreement, the Pledge Agreement and the

Member Product Guide, Emigrant was under the direction and control of FHLBNY

with respect to the pledged Mortgage Collateral, including the pledged Pinti Note

and Pinti Mortgage, and with respect to the segregated vault or storage area at

Emigrant's premises. JA02092 ¶ 105; JA02157; JA02159; JA02291; JA02141;

JA02126; JA02123-JA02124. Between roughly November 2009 and January 2010,

ESB-MH prepared mortgage assignments and note allonges for Mortgage Collateral

pledged or to be pledged as security for loans from FHLBNY. JA02093 ¶ 106;

JA02190; JA02123-JA02124; JA02126; JA02141.

On November 30, 2009, EMC executed a written assignment of the Pinti Mortgage to ESB-MH ("ESB-MH Assignment"). JA02093 ¶ 107; JA02123-JA02124; JA02183; JA02266; JA02291; JA02317-JA02319. Also on November 30, 2009, ESB-MH endorsed the Pinti Note in blank, executed an assignment of the Pinti Mortgage on November 30, 2009 ("FHLBNY Assignment") and maintained the Pinti loan file in a segregated area, all at the direction and with the knowledge of FHLBNY. Id. Under the terms of the Advances Agreement and the Pledge Agreement, FHLBNY was within its contractual rights to at any point take physical possession of the endorsed Pinti Note, the Pinti Mortgage, and the November 30, 2009 FHLBNY Assignment and remove them from Emigrant's premises and FHLBNY was also contractually within its rights to record the FHLBNY Assignment. JA02093 ¶ 108; JA02159; JA02123; JA02134; JA02136.

At the time ESB-MH executed the FHLBNY Assignment, Emigrant Bank intended to proceed with the financing arrangement with FHLBNY. JA02093 ¶ 109; JA02185; JA02190. From November 2009 through January 2010, ESB-MH assigned and transferred 12,322 residential mortgages, including the Pinti Mortgage, and undertook the preparation process to ship the residential loan files to FHLBNY's custodian. JA02093 ¶ 110; JA02235; JA02317;-JA02319; JA02322. As of August 2010, Emigrant Bank was still borrowing money from FHLBNY and Emigrant Bank and ESB-MH, were still proceeding with the assignment project with FHLBY in

connection with pledging the Mortgage Collateral to FHLBNY and were still undertaking preparations to ship the residential loan files to FHLBNY's custodian. JA02094 ¶ 111; JA02188; JA02230; JA2322; JA02328-JA02339.

Despite their efforts, Pinti and Phillips were unable to cure their default by December 28, 2009, the expiration date of the 90-day notice of right to cure, and EMC initiated foreclosure proceedings on the Property. JA01157 ¶ 10. On September 22, 2010, Pinti filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code. JA01157 ¶ 11. Pinti later obtained a discharge in the bankruptcy on February 4, 2011. JA01157 ¶ 12.

On August 22, 2011, EMC served a written response to a Qualified Written Request ("QWR"), which provided Pinti and Phillips with information pertaining to the ownership of the Pinti Note and Pinti Mortgage. JA01157 ¶ 13. The QWR named ESB-MH as the owner of the loan and EMC as the servicer of the loan. JA00191. It also explained that the assignment transferring ownership of the note and mortgage to ESB-MH was not recorded and that the Pinti Note and Pinti Mortgage, as well as the assignment of the Pinti Mortgage were in the possession of EMC. Id.

During the summer of 2012, Pinti and Phillips were in the process of obtaining a reverse mortgage. JA01149 ¶13. Notwithstanding those efforts, EMC proceeded with the foreclosure sale and, on August 9, 2012, sold the Property to Harold Wilion

("Wilion") for $260,000 and recorded the foreclosure deed with the Registry. JA01157-JA01159 ¶¶ 14-16, 19.

Following the sale to Wilion, on September 18, 2012, Sorvillo, an EMC employee at the time, prepared a memorandum for another EMC employee, Juan Minier ("Minier") stating that a third party (i.e., Wilion) paid off the loan for the Pinti Note in the amount of $260,000.00, the amount of the foreclosure sale, requested that Minier credit $48,289.92 to an account for "Legal, RESPA and appraisal," and requested that Minier provide another EMC employee, James Jung, with "a copy of the credit advance." JA00244. On October 3, 2012, Peter Koys ("Koys"), a Vice President at EMC at the time, prepared a discharge ("Discharge") of the Pinti Mortgage and EMC sent it to Pinti for recording. JA00246-JA00249. The letter from EMC accompanying the Discharge instructed Pinti to record the Discharge with the Registry where the deed was recorded and that "it is [in] your best interests to record the Discharge and accompanying documentation as soon as possible." JA00247.

On October 29, 2012, Wilion filed a summary process action state district court against Pinti and Phillips for possession of the Property. JA01161 ¶ 30. On November 7, 2013, in separate litigation contesting the validity of the Pinti Mortgage, the state superior court entered summary judgment in favor of Wilion and EMC. JA01162 ¶ 32. On appeal, the SJC found that the foreclosure sale was void

11

because EMC had violated the statutory scheme applicable to non-judicial foreclosure sales in Massachusetts. The SJC based its decision on a finding that EMC did not strictly comply with paragraph 22 of the Pinti Mortgage, which relates to providing notice of the default. JA01162 ¶¶ 34-35; *Pinti v. Emigrant Mortg. Co., Inc*., 472 Mass. 226, 233–38 (2015) ("Pinti I"). Following this decision, EMC returned the foreclosure sale proceeds to Wilion. JA01163 ¶ 39.

After Pinti I, on July 29, 2015, at EMC's direction, Pinti recorded the Discharge of the Pinti Mortgage with the Registry. JA01162 ¶ 38. In light of the decision in Pinti I voiding the foreclosure sale, and after receiving the Discharge from EMC and being instructed by EMC to record it, Pinti and Philips relied on the Discharge and EMC's instructions and saw no need to exercise any right of redemption in the Property by satisfying the debt previously owed under the terms of the loan. JA00247; JA01163 ¶ 42. Since July 2015, Pinti and Phillips faithfully paid monthly condominium fees in amounts varying from $368 then to $856 monthly at present and are bound by agreement to pay another $60,000 to the condominium association. JA00431 ¶ 27.

On June 17, 2016, EMC sued Pinti and Phillips in the Massachusetts federal district court (Wolf, J.) seeking a declaratory judgment, *inter alia*, striking the Discharge from title to the Property. JA00446-JA00459; JA01164 ¶ 46; *Emigrant Mortgage Company, Inc. v. Pinti et al.*, 16-cv-11136-MLW (D. Mass. Jan. 17, 2019)

("Pinti II"). Pinti and Phillips asserted counterclaims, seeking a declaratory judgment that they owned the Property free of any mortgage, as well as a claim for negligent infliction of emotional distress. ADD006. EMC moved for summary judgment on its claim and Pinti and Phillips' counterclaims. ADD006. The court allowed in part and denied in part the motion, allowing it with respect to Pinti and Phillips' counterclaim for negligent infliction of emotional distress, but otherwise denying it without prejudice. ADD006. The court held a two-day bench trial on January 9, 2019 and January 10, 2019. JA01567-JA01763.

After the bench trial, on January 11, 2019, the Court in Pinti II dismissed the case because EMC lacked standing. ADD008; JA01947-JA01969. In Pinti II, Pinti and Phillips argued that EMC was not the mortgagee on August 9, 2012 because the Pinti Mortgage had been assigned to ESB-MH. JA01950. The Court agreed, ruling that EMC was not the mortgagee of the loan in August 2012 because the Pinti Note had been previously assigned to ESB-MH and that ESB-MH did not reassign it to EMC. JA01951; JA01954. Thus, the Court held that "ESB-MH was the mortgagee on August 9, 2012. EMC was not the proper entity to attempt to foreclose by entry." JA01963. The Court then dismissed EMC's action without prejudice. JA01168 ¶ 60; JA01958; JA01966. EMC moved for reconsideration of the Court's order dismissing its claim to strike the Discharge, arguing that it is the real party in interest under a subservicing agreement that authorized it to commence proceedings on

13

behalf of ESB-MH and required Emigrant to indemnify ESB-MH for certain losses. JA01168 ¶ 61; JA00438-JA00444. The court denied the motion because EMC had not raised this argument at trial. JA01168 ¶ 63; JA00386; JA00389. The court stated that "the party or parties with standing" could seek to strike the allegedly mistaken discharge of the Pinti Mortgage, without actually identifying the party or parties with standing. JA00389. The court also noted that, while the filing of another case may be inefficient, it is not unjust because EMC and ESB-MH "are in the mortgage loan business and should be able to comply with Massachusetts law. Id. To the extent that they are being deprived payments reasonably expected … they're suffering an injury inflicted by their own failures to satisfy the requirements of Massachusetts law." Id.

After the Court's ruling in Pinti II, on September 30, 2019, the FHLBNY Assignment – executed back on November 30, 2009 – was recorded with the Registry. JA00189-JA00190. That same day, on September 30, 2019, an assignment of the Pinti Mortgage from FHLBNY to Emigrant dated June 25, 2019 ("Emigrant Assignment") was recorded with the Registry. JA00252-JA00253.

## II.    District Court Proceedings

Emigrant filed this lawsuit on November 4, 2019 asking the district court to strike from title what it claims is a wrongfully recorded Discharge. JA00018. In its Verified Complaint, Emigrant alleged that it "is the true and lawful holder/owner of

the Pinti Note, which is endorsed in blank" and that it is the holder/owner of the Pinti Mortgage via the 2019 Emigrant Assignment from FHLBNY. JA00018 ¶ 9; JA00021 ¶ 38. On May 18, 2020, Pinti filed an answer and counterclaim with jury demand in which they asserted counterclaims for *inter alia* unfair and deceptive business practices in violation of Mass. Gen. L. c. 93A. JA00088-JA00099.

On June 17, 2020, Emigrant filed a motion for summary judgment. JA00111. Pinti then filed a motion under Rule 56(d) seeking additional discovery and asking that the district court defer ruling on Emigrant's summary judgment motion until that additional discovery was completed. JA00005. Emigrant opposed the Rule 56(d) motion, contending that discovery was available in the earlier Pinti II action. JA00005. The district court denied Pinti's Rule 56(d) motion and then granted Emigrant's motion for summary judgment. JA00006; JA00008.

Pinti filed a notice of appeal on April 22, 2021. JA00009. On April 29, 2021, Emigrant filed a motion for an appeal bond asking the district court to require Pinti to post an appeal bond in the amount of $62,906.19. JA00009; JA01974-JA02027. The district court denied that motion. JA00010.

In her appeal, Pinti contended *inter alia* that the district court abused its discretion in denying her Rule 56(d) motion. JA02028-JA02055. As this Court noted, among other discovery, Pinti sought discovery about the Pinti Note and whether and, if so, at what points, FHLBNY owned the Pinti Mortgage, including

discovery about the FHLBNY Assignment and the Emigrant Assignment (collectively defined by the Court as the "2019 assignments"). Id. This Court further noted that Emigrant had advanced no evidence showing when exactly the FHLBNY Assignment and Emigrant Assignment were delivered, and whether those dates were before or after the Discharge. Id. Following reversal and remand, and consistent with this Court's opinion and judgment, Pinti conducted discovery concerning the chain of custody of the Pinti Note and about whether and, if so, at what points, FHLBNY owned the Pinti Mortgage, including discovery about the 2019 assignments. ADD010.

On March 31, 2023, Pinti filed her opposition to Emigrant's motion for summary judgment, to which Emigrant replied on April 21, 2023. JA02053-JA02074; JA02373-JA02393. On May 10, 2023, the district court heard oral argument. JA00014; JA02558-JA02607. During oral argument, counsel for Emigrant noted that Emigrant intends to seek to recover from Pinti at a future foreclosure sale the interest on the loan over the years and its attorney's fees in this litigation, thereby eating up Pinti's equity in the Property. JA02572-JA02573; JA02599-JA02560.

On December 18, 2023, the district court issued its Memorandum and Order ("Order") granting Emigrant's summary judgment motion entirely. ADD001-ADD035. Among other determinations, the district court found that Emigrant had

established standing to strike the Discharge as a matter of law. Id. In reaching that determination, the district court concluded that "as the bearer of the Pinti Note and the assignee of the June 2019 Emigrant Assignment, Emigrant has standing to seek cancellation of the allegedly erroneous Discharge," notwithstanding the district court's stated assumption "that before the Discharge was issued, [Emigrant's predecessor] ESB-MH transferred the Pinti Mortgage to FHLBNY." ADD015-ADD016.

Next, the district court found that Emigrant had met its burden of showing that the Pinti Mortgage was discharged by mistake. ADD017-ADD022. In reaching that conclusion, the district court relied almost entirely on the Marcano Affidavit. The district court credited Marcano's assertion that the statements in his affidavit were based on his personal knowledge and that he was familiar with the records that "were made and maintained in the regular or ordinary course of business of EMC." ADD018. Relying on Marcano's description of EMC's supposed loan servicing policies and procedures, rather than on the actual policies and procedures themselves that Emigrant never made part of the record, as well as Marcano's statements regarding the *absence* of policies and procedures about preparing and providing discharges, the district court found that EMC prepared the discharge by mistake, even though Marcano never explained the basis for his personal knowledge of EMC's policies and procedures, or the basis for his personal knowledge of an

allegedly mistaken discharge created by other EMC employees, and thus went way beyond simply testifying as to how records are maintained at EMC, and even though Marcano's statements contradicted his prior testimony that he lacked personal knowledge regarding the creation of the discharge. ADD017-ADD022. The district court dismissed as irrelevant contradictory testimony about the discharge's creation from a former EMC employee, Sorvillo, thereby impermissibly acting as factfinder, crediting Marcano's version of events over Sorvillo's, and failing to construe the facts in the light most favorable to Pinti. Id.

After finding the Pinti Mortgage was discharged by mistake, the district court determined on summary judgment that Pinti "ha[d] not shown [she] cannot be restored to [her] original position[.]" ADD028. The district court failed to undertake a proper analysis or balancing of the parties' respective equities or Emigrant's unclean hands. ADD022-ADD028. The district court failed to properly consider the misconduct and unclean hands of Emigrant and EMC – Emigrant's agent – in causing Emigrant's predicament by taking an overly myopic view of the misconduct underpinning the unclean hands analysis. Id. Even if the district court had performed a balancing test, on summary judgment, in the light most favorable to Pinti, there were too many unanswered questions regarding Emigrant and EMC's course of conduct to decide this issue on summary judgment. Further, in granting the equitable remedy of striking the discharge, the district court erred in determining

as a matter of law that Pinti can be substantially restored to her status quo ante position, if at all.  Id.

Finally, the district court determined that Pinti's counterclaim for violation of c. 93A is barred by the statute of limitations because Pinti "reasonably knew as of August 9, 2012, the date of the attempted foreclosure sale, of the conduct that it alleges violates Chapter 93A" and that "[Pinti's] claim expired four years later, on August 9, 2016."  ADD030.  In reaching that determination, however, the district court failed to consider whether the statute of limitations was tolled by the discovery rule and whether Pinti can also bring her c. 93A claim defensively in recoupment and/or setoff in response to Emigrant's claim.  Id.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has been before this Court once before.  JA02028-JA02052; *Emigrant Residential, LLC v. Pinti et al*., No. 21-1330.  There are no other proceedings related to this case currently before this Court.

## STANDARD OF REVIEW

This Court generally "review[s] a district court's ultimate decision to grant or withhold an equitable remedy for abuse of discretion."  *Texaco P.R., Inc.*, 60 F.3d at 875.  However, where a court applies "an improper standard to the facts, it may be corrected as a matter of law."  *United States v. Singer Mfg. Co.*, 374 U.S. 174, 194 n.9, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963). "[A] district court by definition abuses

its discretion when it makes an error of law." *Alison H. v. Byard*, 163 F.3d 2, 4 (1st Cir. 1998).

This Court reviews the decision of the district court to grant summary judgment de novo. *See Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006). Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether that burden is met, like the district court, this Court must take the facts of record in the light most flattering to the nonmovant (here, Pinti) and draw all reasonable inferences in that party's favor. *Nicolo v. Phillip Morris, Inc*., 201 F.3d 29, 33 (1st Cir. 2000). At summary judgment, "the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016) (*quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal quotations omitted)).

Summary judgment is not appropriate even if there is no dispute as to evidentiary facts but only as to conclusions to be drawn therefrom. *See Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Summary judgment on issues that are more often left for a jury is generally appropriate where facts are undisputed and only one conclusion can reasonably be drawn from them.

*See Edwards v. Consol. Rail Corp.*, 567 F. Supp. 1087, 1091 (D.D.C. 1983), aff'd, 733 F.2d 966 (D.C. Cir. 1984). Summary judgment may be improper even where historic facts are free of controversy. *See N. L. R. B. v. Smith Indus., Inc.*, 403 F.2d 889, 893 (5th Cir. 1968). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995).

## SUMMARY OF ARGUMENT

First, Emigrant is not the mortgagee and thus lacks standing to seek to strike the discharge because when FHLBNY attempted to assign the Pinti Mortgage to Emigrant in 2019, the Pinti Mortgage had been discharged, and thus the attempted assignment was void because FHLBNY had nothing to assign.

Second, rather than viewing the summary judgment record and the reasonable inferences therefrom regarding Emigrant's alleged mistaken discharge in the light most favorable to Pinti, the district court credited Emigrant's version of the record and made factual determinations and inferences in Emigrant's favor.

Third, before setting aside the discharge based on equity, the district court failed to balance the parties' equities by considering whether Emigrant's culpability and unclean hands negate its entitlement to equitable relief and whether Pinti could be restored to her status quo ante position.

Fourth, in dismissing Pinti's c. 93A counterclaim, the district court: (1) failed to consider whether the discovery rule tolled the statute of limitations since Pinti only discovered Emigrant's wrongful conduct as a result of the January 11, 2019 ruling in the Pinti II case; and (2) failed to consider whether Pinti can also bring her c. 93A claim defensively in recoupment and/or setoff.

## ARGUMENT

**I.  Emigrant's MSJ, Assessed Under the Proper Standard, Failed to Show the Absence of Genuine Issues of Material Fact as to Whether Emigrant is the Current Owner of the Pinti Mortgage and Has Standing to Strike the Discharge**

To have standing, Emigrant must show that it was the mortgagee when it commenced this action. *Eaton v. Fed. Nat. Mortg. Ass'n*, 462 Mass. 569, 571, 969 N.E.2d 1118, 1121 (2012). In Massachusetts, the term "mortgagee" refers to the person or entity that owns/holds the mortgage and that either owns/holds the mortgage note or is acting on behalf of the note owner/holder. *Id.* To have standing, the mortgagee must own/hold the mortgage pursuant to a valid, written assignment and be able to provide proof of such. *See U.S. Bank Nat. Ass'n v. Ibanez*, 458 Mass. 637, 649-52, 941 N.E.2d 40, 51-54 (2011).[2]

_____

[2] In Massachusetts, physical possession of the note and mortgage is not what determines standing. Rather, *ownership* (i.e., having the right to enforce) is what is required. *See Eaton*, 462 Mass. at 571, 579-80 and n. 2 ("[T]he term 'note holder' is used to refer to a person or entity owning the 'mortgage note.'"); *Ibanez*, 458 Mass. at 649-52.

If the FHLBNY Assignment was delivered to FHLBNY prior to the discharge of the Pinti Mortgage that Pinti received in 2012 and recorded in 2015, then it would be a valid assignment of the Pinti Mortgage from ESB-MH to FHLBNY; if it was delivered after the discharge, then it would have been a void assignment since ESB-MH had nothing to assign. *See Wilson v. HSBC Mortg. Servs*., 744 F.3d 1, 9 (1st Cir. 2014); *Culhane v. Aurora Loan Servs. of Nebraska*, 708 F.3d 282, 291 (1st Cir. 2013); *Barcelos v. Deutsche Bank Nat'l Tr. Co*., 86 Mass. App. Ct. 1102, 10 N.E.3d 1145 (2014); *Ibanez*, 458 Mass. at 651 ("[T]here must be proof that the assignment was made by a party that itself held the mortgage.").

Viewed in the light most favorable to Pinti, the record shows that Emigrant was not the mortgagee when it commenced this lawsuit in November 2019 (nor is it the mortgagee now), and thus lacks standing. ESB-MH (Emigrant's predecessor) transferred the Pinti Note and Pinti Mortgage to FHLBNY no later than November 2009 when ESB-MH gave the FHLBNY Assignment. When FHLBNY attempted to assign the Pinti Mortgage back to Emigrant in 2019, the Pinti Mortgage had been discharged, and thus the attempted assignment was void because FHLBNY had nothing to assign. FHLBNY is the party that has standing to seek to strike the discharge of the Pinti Mortgage. *See Eaton*, 462 Mass. at 583–84.

Under Massachusetts law, whether there was a delivery of the Pinti Note and Pinti Mortgage is not dependent on recording; legal title passes upon delivery. *See*

*Ibanez*, 458 Mass. at 651; *Lamson & Co. v. Abrams,* 305 Mass. 238, 243 (1940).

Whether there has been a delivery depends upon the parties' intent to effect a transfer

(actual physical delivery of the instrument is not required) and is ordinarily a

question of fact. *See Frankowich v. Szczuka*, 321 Mass. 75, 77, 71 N.E.2d 761, 762

(1947); *Sullivan v. Hudgins*, 303 Mass. 442, 447, 22 N.E.2d 43, 46 (1939).

The terms of the Advances Agreement and the Pledge Agreement are clear

and unambiguous, govern Emigrant's relationship with FHLBNY, and are still in

effect today. As such, the intent of the parties must be found within the four corners

of these contracts. *See Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC,* 16 F.4th

304, 308 (1st Cir. 2021)*; Chesapeake Energy Corp. v. Bank of New York Mellon Tr.

Co*., 773 F.3d 110, 114 (2d Cir. 2014). The plain language of these contracts shows

that ESB-MH assigned, transferred, and pledged full ownership of the Pinti Note

and the Pinti Mortgage to FHLBNY under the Pledge Agreement no later than

November 2009 when ESB-MH gave the FHLBNY Assignment. Once ESB-MH

pledged the Pinti Note and Pinti Mortgage as collateral and gave the FHLBNY

Assignment, the plain terms of the Pledge Agreement show that ESB-MH (as the

mortgagee/pledgor) was divested of ownership of the Pinti Note and Pinti Mortgage

and thus the power to enforce these instruments against the mortgagor and the real

estate. *See Lamson & Co.*, 305 Mass. 238, 243–44; 59 C.J.S. Mortgages § 720

("Once a mortgagee pledges a mortgage as collateral, he or she is himself or herself

divested of the power to foreclose."). *Cf. Nichols v. Cadle Co.*, 139 F.3d 59 (1st Cir.1998) (in case predating the *Ibanez* and *Eaton* decisions, the agreement reserved to pledgor right to collect and foreclose mortgage loan; court found pledgor to be "the mortgagee" under Massachusetts statute, notwithstanding the pledge, which it described as transferring "something less than the ordinary full 'ownership' of a mortgage"). ESB-MH no longer owned/held the Pinti Note and Pinti Mortgage as of November 2009 and thus had no standing to foreclose.

As described, on August 4, 2009, FHLBNY demanded that ESB-MH deliver the Pledgor Collateral to FHLBNY, and notified that it was moving Emigrant Bank and its subsidiaries and affiliates (including ESB-MH) to the "Listing & Segregation II" collateral category for all of Emigrant Bank and its affiliates' pledged Mortgage Collateral. As a result, Emigrant Bank and its subsidiaries and affiliates were required to: (1) endorse each promissory note in blank; (2) prepare mortgage assignments to FHLBNY in recordable form as required by the recording district; (3) stamp the outer front cover of the loan file with "The Note and Mortgage Relating to this Loan Have Been Assigned to the Federal Home Loan Bank of New York"; and (4) maintain the loan files in a segregated vault or storage area with signage marked "Federal Home Loan Bank of New York." As of August 2009, Emigrant Bank intended to comply with these obligations and was under the direction and control of FHLBNY with respect to the pledged Mortgage Collateral and with

25

respect to the segregated vault or storage area at Emigrant's premises. (Id., ¶ 104-105.)

ESB-MH endorsed the Pinti Note in blank, executed the FHLBNY Assignment on November 30, 2009 and maintained the Pinti loan file in a segregated area, all at the direction and with the knowledge of FHLBNY. (Id., ¶ 107.) Under the terms of the Advances Agreement and the Pledge Agreement, FHLBNY had the right to take physical possession of the endorsed Pinti Note, the Pinti Mortgage, and the November 30, 2009 FHLBNY Assignment and record the FHLBNY Assignment. (Id., ¶ 108.) At the time ESB-MH executed the FHLBNY Assignment, Emigrant Bank intended to proceed with the financing arrangement with FHLBNY, and, as of August 2010, Emigrant Bank was still borrowing money from FHLBNY and Emigrant Bank and ESB-MH, were still proceeding with the assignment project with FHLBY in connection with pledging the Mortgage Collateral to FHLBNY, and were still undertaking preparations to ship the residential loan files to FHLBNY's custodian. (Id., ¶ 111.)[3]

---

[3] Despite being required to do so under the Advances Agreement and the Pledge Agreement with FHLBNY, Emigrant did not maintain records listing the Pledgor Collateral pledged to FHLBNY under the Pledge Agreement—including the Pinti Note and the Pinti Mortgage. (Id., ¶ 95.) Unless and until FHLBNY receives a written request from Emigrant, "Collateral", "Mortgage Collateral" and "Mortgage Documents" are not removed from the Pledgor Collateral pledged to FHLBNY under the Advances Agreement or Pledge Agreement or redelivered or reassigned back to Emigrant from FHLBNY, even if the item of Pledgor Collateral fell out of FHLBNY's eligibility criteria for Pledgor Collateral. (Id., ¶ 96.) Emigrant produced

The plain language of the Advances Agreement and the Pledge Agreement, coupled with the August 4, 2009 letter and the Member Product Guide, shows that on November 30, 2009, ESB-MH—pursuant to the Pledge Agreement and at FHLBNY's direction—endorsed the Pinti Note in blank (thus making it bearer paper), executed the FHLBNY Assignment, and delivered the Pinti Note, Pinti Mortgage and FHLBNY Assignment to FHLBNY's possession.[4] Therefore, no later than November 30, 2009, FHLBNY was the owner/holder of the Pinti Note and Pinti Mortgage.

Notwithstanding this legal impediment to standing, the district court concluded that Emigrant had established standing to strike the Discharge. ADD012-016. The district court first noted "the parties dispute whether the FHLBNY Assignment was delivered in 2009, as collateral under the Pledge Agreement, or in 2019, as part of Emigrant's attempts to clarify its chain of title prior to filing the present lawsuit" ADD015. The district court then credited the assumption that "before the Discharge was issued, ESB-MH transferred the Pinti Mortgage to

---

no admissible evidence during discovery showing that the Pinti Note and Pinti Mortgage were not pledged to FHLBNY under the Pledge Agreement, that these instruments were ever removed from the Pledgor Collateral pledged to FHLBNY, or that these instruments were ever redelivered or reassigned back to Emigrant from FHLBNY. (Id., ¶ 112.)

[4] Delivery means transfer of possession, actual or constructive, from one person to another. *See* M.G.L. c. 106, § 1-201(14). *See also* 1 Anderson U.C.C. §§ 1-201:199, 1-201:200, 1-201:202, 1-201:265.

FHLBNY." ADD015. The district court then posited that, "[e]ven with this assumption, if the Emigrant Assignment executed by FHLBNY on June 24, 2019 was effective, then regardless of when the Pinti Mortgage previously was assigned to FHLBNY, Emigrant became the mortgage holder prior to initiating this litigation." ADD015. The district court then committed error when it concluded that "as the bearer of the Pinti Note and the assignee of the 2019 Emigrant Assignment, Emigrant has standing to seek cancellation of the allegedly erroneous Discharge." ADD016.

That is, the district court concluded that, notwithstanding the fact that the Discharge extinguished the Pinti Mortgage, Emigrant has standing to seek to strike the Discharge by virtue of it being the holder of the Pinti Note. ADD016. To arrive at that conclusion, the district court relied on an unpublished Massachusetts Superior Court case, *US Bank Nat. Ass'n v. Twomey*, No. MICV200905070F, 2012 WL 2335295, at *1, 4-5 (Mass. Super. May 23, 2012), aff'd, 83 Mass. App. Ct. 1130, 987 N.E.2d 618 (2013). The *Twomey* case does not support the district court's ruling. The district court committed a clear error.

In *Twomey*, the court cited the SJC's seminal *Ibanez* decision for the proposition that the transfer of a note automatically transfers an equitable interest in the underlying mortgage, even without a formal assignment. 2012 WL 2335295, at *4 (*citing Ibanez*, 458 Mass. at 652). The *Twomey* court then determined that U.S.

Bank was a real party in interest "[b]ecause U.S. Bank held the note endorsed in blank, it had an equitable right to command MERS to assign the mortgage to it." *Id.* (*citing Ibanez*, supra). That is true as far as it goes, but it does not get Emigrant very far.

Under Massachusetts law, an individual who totally assigns an interest lacks standing to sue on that interest. *See Provident Co-op. Bank v. James Talcott, Inc.*, 358 Mass. 180, 187–88, 260 N.E.2d 903 (1970) (holding that a mortgagee who had fully assigned a note and mortgage lacked standing to sue on that mortgage). Contrary to the decisions of both the *Twomey* court and the district court, a noteholder's equitable right to obtain a mortgage assignment does not confer standing to assert rights on a mortgage that was assigned to and is owned by another. *Cf. Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 149 (1st Cir. 2002) (*citing U.S. Olympic Comm. v. Intelicense Corp., S.A.*, 737 F.2d 263, 268 (2d Cir. 1984) (holding that "[o]nly the owner of an interest in property at the time of the alleged taking has standing to assert that a taking has occurred")). Further, both the *Twomey* court and the district court either ignored or failed to consider the line of cases showing that the 2019 Emigrant Assignment of the Pinti Mortgage from FHLBNY to Emigrant was void because FHLBNY had nothing to assign. *See Wilson*, 744 F.3d at 9; *Culhane*, 708 F.3d at 291; *Ibanez*, 458 Mass. at 651.

If Emigrant wanted the Pinti Mortgage reassigned back to it, FHLBNY needed to execute and deliver a written assignment of the Pinti Mortgage to Emigrant. In Massachusetts, a mortgage assignment is a conveyance of an interest in land that requires a writing signed by the grantor. *Ibanez*, 458 Mass. at 649 (*citing, inter alia*, Mass. Gen. Laws ch. 183, § 3). In *Ibanez*, the SJC said that "[i]n Massachusetts, where a note has been assigned but there is no written assignment of the mortgage underlying the note, the assignment of the note does not carry with it the assignment of the mortgage…[r]ather, the holder of the mortgage holds the mortgage in trust for the purchaser of the note, who has an equitable right to obtain an assignment of the mortgage, which may be accomplished by filing an action in court and obtaining an equitable order of assignment." 458 Mass. at 653-54 (citation omitted). But *Ibanez* also said that "[i]n the absence of a valid written assignment of a mortgage or a court order of assignment, the mortgage holder remains unchanged." *Id*. at 653.

The point is, FHLBNY remained the owner of the Pinti Mortgage unless and until assigned in writing to Emigrant, regardless of any equitable right Emigrant may have had to obtain an assignment. FHLBNY did not execute the Emigrant Assignment (or any other assignment) attempting to reassign the Pinti Mortgage

back to Emigrant until 2019. At that time, of course, the Pinti Mortgage had been discharged and thus the FHLBNY had nothing to assign.[5]

FHLBNY, not Emigrant, is the real party in interest under Fed. R. Civ. P. 17(a) that has standing to seek to strike the Discharge. As noted, to have standing, Emigrant must show that it was the mortgagee when it commenced this action, meaning that it owned (not merely had an equitable interest) both the Pinti Mortgage and the Pinti Note. *Eaton*, 462 Mass. at 571. Rule 17(a) instructs that, "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). The function of the rule is "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Fed. R. Civ. P. 17(a), Advisory Committee Notes, 1966 Amendment; *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.*, 620 F.2d 1, 4 (1st Cir.1980). The effect of the rule "is that the action must be brought by the person who, according to the governing

_____

[5] Even assuming Emigrant later reacquired ownership of the Pinti Note by possession, this would not give Emigrant standing or otherwise change the analysis. As the SJC has consistently noted, the mortgage does not, as a matter of Massachusetts real property law, automatically follow the note; a separate written assignment of the mortgage is required. *See Eaton*, 462 Mass. at 576; *Ibanez*, 458 Mass. at 652. In order to have standing, Emigrant also needed to reacquire ownership (not merely possession) of the Pinti Mortgage, and that could only be accomplished by a valid, written instrument signed by FHLBNY naming Emigrant as assignee. *Eaton*, 462 Mass. at 571, 579-80; *Ibanez*, 458 Mass. at 649-52 (an assignment of a mortgage or any document that transfers title cannot be treated like a negotiable instrument and bearer paper under Article 3 of the UCC).

substantive law, is entitled to enforce the right. *Thus, the action will not necessarily be brought in the name of the person who ultimately will benefit from the recovery*." 6A Charles Alan Wright et al. Federal Practice and Procedure § 1543 (3rd ed. 2010) (*citing Prevor-Mayorsohn Caribbean, Inc*., 620 F.2d at 4) (emphasis added). A real party in interest is therefore "the person holding the substantive right sought to be enforced." *Lopes v. JetSetDC, LLC*, 994 F.Supp.2d 126, 135 (D.D.C.2014). A party that does "not possess[ ] a right under substantive law is not the real party in interest with respect to that right and may not assert it." *Farrell Constr. Co. v. Jefferson Parish, La*., 896 F.2d 136, 140 (5th Cir.1990).

Emigrant neither has standing nor is it a real party in interest under Rule 17(a) because it acquired no substantive rights in the Pinti Mortgage via the Emigrant Assignment in 2019 since FHLBNY had nothing to assign. This is true regardless of whether Emigrant is the entity that would ultimately benefit from the Discharge being struck.

## II.     Emigrant's MSJ, Assessed Under the Proper Standard, Failed to Show the Absence of Genuine Issues of Material Fact as to Whether the Pinti Mortgage Was Discharged by Mistake

Because Emigrant filed the complaint and seeks to change the status quo, it bears the burden of proving by "full, clear, and decisive proof" that EMC issued the mortgage discharge by mistake. *Eisenhauer*, 49 Mass. App. Ct. at 730 (internal quotations and citations omitted). At summary judgment, the district court was

required to consider all of the evidence and reasonable inferences drawn from the evidence in the light most favorable to Pinti, as the non-moving party. The district court erred by not following this standard.

### A.    The District Court Erred in Relying on the Marcano Affidavit

The district court improperly admitted and credited the statements in the Marcano Affidavit and then ignored other evidence contradicting the Marcano Affidavit and weighing in Pinti's favor.  For several reasons, the district court erred in admitting statements in Marcano Affidavit regarding Emigrant and EMC's alleged policies and procedures and mistaken discharge.

*First*, Marcano's statements regarding EMC and Emigrant's policies and procedures and mistake were admitted in violation of Fed. R. Evid. 602, which requires that a witness have personal knowledge about the matters to which he testifies.  "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  Testimony is "inadmissible under Rule 602 only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed what he testified to."  *United States v. Rodríguez*, 162 F.3d 135, 144 (1st Cir. 1998).

The district court relied heavily on Marcano's statements at paragraphs 3, 18 and 19 of his affidavit regarding his claimed personal knowledge of Emigrant and

EMC's purported loan servicing policies and procedures. ADD017-ADD020. But Marcano failed to lay a proper foundation for his purported knowledge of the policies and procedures. He failed to identify his duties and responsibilities as the Assistant Treasurer for EMC, much less establish he has personal knowledge of how records are made and kept by his employer, EMC, and certainly not as to Emigrant, which Emigrant admits is a separate entity from EMC. JA00144-JA00146 ¶¶ 3, 18-19.

Moreover, Marcano based his statements regarding mistake on his alleged review and/or knowledge of unspecified policies and procedures. He doesn't say if they are written or unwritten, much less describe them in any manner of sufficient detail. If they were unwritten, then again Marcano failed to show how he has personal knowledge of the policies and procedures based on his roles and responsibilities; he failed to lay sufficient foundation for his personal knowledge, especially as to Emigrant where he works for EMC, a separate entity.

Also, at paragraph 19, Marcano says neither EMC nor Emigrant have ever had a policy of preparing discharges after third-party purchase from foreclosure sale. He uses this as evidence of mistake. JA00146 ¶ 19. But Marcano's statement runs afoul of a key aphorism: the "absence of evidence is not evidence of absence." That is, the purported absence of policy at EMC is not proof that EMC did not intentionally prepare the discharge. It is clear from the district court's opinion that she considered the absence of such a policy to support Emigrant's burden of proof. ADD005. That

34

can't be. "An absence of evidence does not cut in favor of the one who bears the burden of proof on an issue." *Howard v. Wal-Mart Stores, Inc*., 160 F.3d 358, 360 (7th Cir. 1998); *see also United States v. 15 Bosworth St*., 236 F.3d 50, 55 (1st Cir. 2001) (citing cases); *Perez v. Volvo Car Corp.,* 247 F.3d 303, 310 (1st Cir. 2001) (on summary judgement, "an absence of evidence on a critical issue weighs against the party -- be it the movant or the nonmovant -- who would bear the burden of proof on that issue at trial."). It was Emigrant's burden to prove that its decision to prepare and send the discharge was a mistake. In effect Emigrant and then the district court attempted to shift the burden of proof to Pinti to disprove Emigrant's claim of mistake, which is not what the law requires on summary judgment. The failure of Emigrant to create a factual record showing either it or EMC had a policy in place for preparing discharges in no way supports a finding that Emigrant met its burden of proof.

**Second**, Marcano also fails to show he has personal knowledge of the allegedly mistaken discharge prepared by other EMC employees. Marcano makes statements, which the district court credited, about how other EMC employees interpreted the September 18, 2012 memorandum prepared by Sorvillo (i.e., Minier and Koys). JA00147 ¶¶ 23-27; ADD017-ADD020. But Marcano never explains how he could have personal knowledge of Minier's interpretation of the memo or of Koys's understanding and intent when he prepared the discharge. Indeed, neither

Marcano nor Emigrant offered any proof that Koys even saw Sorvillo's September 2012 memorandum or relied in any way on the statements therein when he executed the discharge of the Pinti Mortgage.   JA01170 ¶ 70.   Moreover, with these statements, Marcano went way beyond simply testifying as to how records are made and kept at EMC for purposes of satisfying the hearsay business records exception in Fed. R. Evid. 803(6).  *See Wallace Motor Sales, Inc. v. Am. Motor Sales Corp*., 780 F.2d 1049, 1061 (1st Cir. 1985).  The district court erred in admitting Marcano's statements based on the business records exception.  ADD018.

*Third,* apart from the fact that paragraphs 18-19 and 23-27 of the Marcano Affidavit lack the time-tested predicate for reliability that is personal knowledge, his statements in these paragraphs were inadmissible hearsay, and potentially double hearsay, as they were offered to prove the contents of the original records.  Fed. R. Evid. 801(c), 802.  His testimony also violated the best evidence rule, which requires a proponent to submit the original of a writing or record in order to prove the contents thereof, unless he can show a sufficient excuse for its nonproduction.  *See Sylvania Elec. Prod., Inc. v. Flanagan*, 352 F.2d 1005, 1008 (1st Cir. 1965); Fed. R. Evid. § 1002.  Marcano made no such showing.  Had Marcano submitted these records and established they were made in the regular course of business, they would have been admissible under the business records exception to the hearsay rule.  *See* Fed. R. Evid. 803(6).  But Marcano failed to attach or otherwise incorporate such business

records to his affidavit, so he cannot rely on the Fed. R. Evid. 803(6) business records exception. *See* Fed. R. Civ. P. 56(c)(1)(A) and Fed. R. Civ. P. 56 advisory committee's note 2010. The business records exception to the rule against hearsay allows for the admission of business records and not testimony in lieu of the business records. *See Deutsche Bank Natl. Trust Co. v Elshiekh*, 179 A.D.3d 1017, 1021, 118 N.Y.S.3d 183, 188 (App. Div. 2020) ("Evidence as to the content of business records is admissible only where the records themselves are introduced; without their introduction, a witness's testimony as to the contents of the records is inadmissible hearsay.").

With respect to Emigrant, even if Marcano had produced its policies and procedures, they would still be inadmissible hearsay because they would have been made by Emigrant, not EMC. *Eisenhauer*, 49 Mass. App. Ct. at 733–735 (where records made by one business were transferred to another, latter business unable to admit records under business record exception because records were made by former business). Marcano never shows how he could be sufficiently familiar with Emigrant's policies and procedures that he can testify not just that the records are kept in the ordinary course of business, but also to how and when they were created, retained and retrieved.

***Fourth***, Marcano's statements regarding mistake contradict his prior testimony in Pinti II. JA00147 ¶¶ 23-27. In Pinti II, Marcano testified that he did

not know why the discharge was made, rather he had a belief that it was made in error, but he did not claim to have actual knowledge of circumstances surrounding the creation of the document. JA01147. Marcano's statements regarding mistake in his affidavit were incompetent summary judgment evidence under the principle of the sham-affidavit doctrine. *See generally Escribano-Reyes v. Prof'l HEPA Certificate Corp.*, 817 F.3d 380, 384-87 (1st Cir. 2016).

**B.  The District Court Erred in Crediting Marcano's Version of Events Over Sorvillo's**

At deposition, Sorvillo testified as to her understanding and intentions in preparing her September 18, 2012 memorandum and as to the preparation of the Discharge. Sorvillo testified that she did not believe that she made a mistake in preparing the memorandum that would have caused a discharge to be accidentally made. JA01096. As this was her personal act, she knows what her intentions or beliefs were. Without the Marcano Affidavit, there was nothing to refute Sorvillo's testimony. And critically, when asked at deposition if she recalled any policies in place at EMC in 2012 regarding the preparation of such memoranda, she answered there were none. JA01106. Nevertheless, the district court improperly credited Marcano's statements over Sorvillo's testimony. ADD020-ADD021. Determining which view more accurately reflects reality requires factfinding and credibility judgments that are properly the task of a finder of fact. *See, e.g., Ahmed v. Johnson*, 752 F.3d 490, 502 (1st Cir. 2014).

### C. EMC or Emigrant Returning the Pinti Note Was Not Required for a Valid Discharge of the Pinti Mortgage

Having stripped out Sorvillo's testimony and taken Marcano's version of events as gospel, the district court found dispositive the fact that neither EMC nor Emigrant had returned the Pinti Note, cancelled or otherwise to Pinti. ADD021-ADD022. However, nothing under Massachusetts law required the return or cancellation of the Pinti Note as a prerequisite for a valid discharge of the Pinti Mortgage. Applying the proper standard on summary judgment, and considering all of the evidence and reasonable inferences drawn from the evidence in the light most favorable to Pinti, Emigrant failed to meet its burden of proving by full, clear, and decisive proof that the mortgage discharge was issued by mistake. *Eisenhauer*, 733 N.E.2d at 560. In the least, Pinti presented sufficient facts to withstand summary judgment on the question of whether the Pinti Mortgage was discharged by mistake. The issue is one for the finder of fact at trial. *See Ahmed*, 752 F.3d at 502.

### III. Emigrant's MSJ, Assessed Under the Proper Standard, Failed to Show the Absence of Genuine Issues of Material Fact as to Whether (1) Emigrant Was Entitled to Equitable Relief Given Its Misconduct and Unclean Hands and (2) Pinti Can be Restored to Her Status Quo Position

Even assuming Emigrant met its burden of showing a mistaken discharge (it did not), the district court was required to undertake a balancing of the equities to consider the conduct and potential hardships of both parties involved in the case, resolving all disputed factual questions material to the balancing of equities in Pinti's

favor on summary judgment.  *See  Texaco P.R., Inc.,* 60 F.3d at 878; *Wells Fargo Bank*, 76 Mass. App. Ct. at 6.  It did not.

The district court noted the general rule that, "where a mortgage has been discharged by mistake, equity will set the discharge aside and reinstate the mortgage to the position the parties intended it to occupy, where the rights of intervening lienors have not been affected." ADD017 (*quoting North Easton Coop. Bank v. MacLean*, 300 Mass. 285, 292, 15 N.E.2d 241 (1938) and *citing E. Bos. Sav. Bank v. Ogan*, 428 Mass. 327, 333, 701 N.E.2d 331, 336 (1998)).  That proposition is true. But balancing the equities is a predicate issue: can the Court invoke equity to find that the discharge was prepared by mistake, and set the discharge aside and reinstate the Pinti Mortgage, in a way that will directly benefit Emigrant, to the detriment of Pinti?

The first factor the district court was required to consider is Emigrant and EMC's actions, because their culpability may negate the use of equitable relief.  *See Ogan*, 428 Mass. at 331; *Childs v. Stoddard*, 130 Mass. 110, 111-12 (1881).  In Pinti II, the district court judge noted that EMC's carelessness and failure to comply with Massachusetts law was the cause of its predicament.  In contrast, no finding or argument that Pinti acted unreasonably in recording and relying on discharge has been made.  Nor did the district court give consideration to when Emigrant and EMC discovered their so-called mistake.  "The law ministers to the vigilant not to those

40

who sleep on perceptible rights." *Puleio v. Vose*, 830 F.2d 1197, 1203 (1st Cir.1987). Nor did the district court give consideration to the numerous "mistakes" made by Emigrant and EMC with respect to not just Pinti, but also the apparent thousands of "mistakes" sitting in Emigrant and EMC's files, of mortgage assignments that transferred those thousands of mortgages and have never, apparently, been accurately reflected in the recordings by EMC, ESB-MH, FHLBNY and Emigrant, and in fact which Emigrant has taken upon itself to destroy. ADD025; JA02099-JA02100 ¶¶ 149-151.

In the light most favorable to Pinti, EMC's preparation of the discharge might not, in these circumstances, have been a mere negligent mistake but rather, reckless, deliberate, unprofessional, incompetent, and possibly misfeasant. *See, e.g., Fidelity Mgmt. & Research Co. v. Ostrander,* 40 Mass. App. Ct. 195, 200, 662 N.E.2d 699 (1996) (*quoting from United States v. Perez-Torres,* 15 F.3d 403, 407 (5th Cir. 1994) ("[T]he doors of equity' are closed 'to one tainted with inequitableness or bad faith relative to the matter in which [he] seeks relief'"). The judge in Pinti II made this observation regarding EMC's shoddy business practices. The same goes for Emigrant's knowledge of and inaction after the discharge. Equitable relief is not afforded to a party who, acting with knowledge of the facts, first fails to seek equitable relief and takes some other course of action, then subsequently attempts to obtain equitable relief and avoid the consequences of its action. *See Childs*, 130

Mass. at 111-112. Although EMC's decision to prepare the discharge, and EMC and Emigrant's inaction afterwards, may have been seen as simply being an oversight, and thus merely "innocent, unfortunate neglect," *Provident Co-operative Bank*, 358 Mass. at 186, 260 N.E.2d at 907, on summary judgment, in the light most favorable to Pinti, there are too many unanswered questions regarding Emigrant and EMC's course of conduct to decide this issue on summary judgment. Emigrant's testimony and credibility, like Pinti's, must be tested and evaluated at trial. *See Nat'l Lumber Co.*, 76 Mass. App. Ct. at 7.

Moreover, it is a fundamental maxim of equity applicable here that "[h]e who seeks equity must do equity." *Manufacturers' Fin. Co. v. McKey*, 294 U.S. 442, 449, (1935); *New England Merchants Nat. Bank of Boston v. Kann*, 363 Mass. 425, 428 (1973); *Charette v. Gelinas*, 88 Mass. App. Ct. 1117 (2015). "Although often linked, the doctrine that one who seeks equity must do equity differs from the principle that one must come into equity with clean hands, in that requiring a plaintiff to 'do equity' assumes that different equitable rights have arisen from the same subject matter or transaction, some in favor of the plaintiff and some in favor of the defendant, so that the plaintiff is required to recognize and provide for the defendant's rights, and relief is granted only upon a showing that the defendant's rights are protected." 30A C.J.S. Equity § 102 (citing cases). *See also Ramirez v. Collier*, 595 U.S. 411, 434, 142 S. Ct. 1264, 1282, 212 L. Ed. 2d 262 (2022) ("[A]

party's inequitable conduct can make equitable relief inappropriate."). Unlike with the unclean hands doctrine, with the do equity doctrine "[t]he whole transaction is usually considered, not merely the particular phase on which the party who seeks the relief bases his or her right." 30A C.J.S. Equity § 107.

The district court confused or conflated the separate "do equity" and "unclean hands" doctrines. As discussed below, unclean hands, unlike "do equity," requires inequitable conduct by the plaintiff that is related to the matter in controversy and provides a complete defense to the plaintiff's action. The separate "do equity" doctrine weighs heavily in favor of Pinti in any balancing test. It precludes Emigrant's equitable claim where both Emigrant and the district court failed to recognize and protect Pinti's rights. At a minimum, before giving Emigrant equity, the district court should have compelled Emigrant to accommodate the equities favoring Pinti by conditioning Emigrant's relief upon the enforcement of those equities, e.g., by imposing the condition that Emigrant compensate Pinti for the lost equity in her house and accrued mortgage loan interest and attorney's fees dating back 15 years.

The district court largely based its decision to grant Emigrant equitable relief on the separate unclean hands doctrine, which provides that "a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands." *Texaco P.R., Inc.*, 60 F.3d at 880 (*citing Precision*

*Instrument Mfg. Co. v. Automotive Maintenance Mach. Co*., 324 U.S. 806, 814 (1945). The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co.*, 324 U.S. at 814. Before reaching the merits of Emigrant's claim that the discharge was prepared by mistake, unclean hands is a predicate issue. Here, when ruling in equity, the district court should have taken into account EMC and Emigrant's misconduct causing the Discharge and the resulting decade-plus of litigation and significant monetary cost to Pinti. As a sophisticated bank, Emigrant should not be given equity.

The district court took an overly myopic view of the misconduct underpinning the unclean hands analysis, which again is but one maxim of equity relevant to the balancing of equities. Under the unclean hands doctrine, a plaintiff who comes into a court of equity to obtain relief cannot do so if it has acted inequitably, unfairly, or dishonestly relative to the controversy in issue. *Precision Instrument Mfg. Co.*, 324 U.S. at 814. The district court erred by looking only at Emigrant and EMC's conduct in sending the Discharge, as opposed to Emigrant and EMC's entire body of malfeasance *relative to* the Discharge and the resulting harm caused to Pinti. Emigrant's misconduct in relation to the Discharge—both before and after sending—falls within the unclean hands doctrine because it infected and is

sufficiently related to Emigrant's equitable claim to strike the Discharge so as to affect the equitable relation of the parties.

Another equitable maxim relevant here is that the remedy of rescission or striking of the discharge is only to be invoked where the parties can be substantially restored to their status quo ante positions. *See* 30A C.J.S. Equity § 43 (noting that equitable relief "will not be granted unless the relief can place the parties in the status quo."). The district court abused its discretion and erred by finding—on summary judgment—that Pinti can be restored to her status quo. Most importantly, the district court failed to consider that, as a direct result of Emigrant's misconduct, Pinti stands to lose the significant equity in her house built up over the years since the Discharge where Emigrant has stated its intent to pursue hundreds of thousands of dollars in attorney's fees and interest accrued over that time. JA02572-JA02573; JA02599-JA02560. On Emigrant's side, the record reflects a pervasive pattern of carelessness, failure to comply with Massachusetts law and other misconduct by Emigrant and EMC constituting unclean hands, which closes the doors of the Court to Emigrant's request for the equitable relief of striking the discharge. For this reason alone, the district court erred in finding that Pinti could be restored to her pre-Discharge status quo position.[6]

---

[6] Perhaps unintentionally, in discussing whether Pinti could be restored to her status quo position, the district court alluded to the "do equity" doctrine when it stated that "Massachusetts law does not preclude recission even where restoration of the status

The district court also erred by dismissing the prejudice to Pinti resulting from: (1) after the Discharge, being force to litigate two separate cases at both the trial court and the appellate court level; and (2) after the Discharge, paying condo fees, which have increased the value of the Property, and entering into a settlement with her condo association based on the mortgage having been discharged. Regarding Pinti's attorney's fees, the district court determined that reimbursing Pinti for these was not necessary to restore Pinti to her pre-Discharge position. In reaching its decision, the district court relied on *Less v. Berkshire Hous. Ser.*, No. 00-30033-MAP, 2000 WL 1615740, at *7 (D. Mass. Sept. 8, 2000). The *Less* case is wholly inapposite. Unlike this case, the court in *Less* was determining whether to impose on the plaintiff the defendant's costs and attorney's fees as a sanction after the plaintiff voluntarily dismissed his employment discrimination lawsuit. The *Less* case had nothing to do with balancing the equities or restoring the parties to their status quo position.

All told, this has cost Pinti far more than the amount allegedly owed in the Pinti Note. Pinti cannot be substantially restored to her pre-discharge position. In the least, the district court undertook no analysis of Emigrant's culpability or the

---

quo is not feasible and that "[t]his Court may tailor its award of equitable relief based on the facts of a given case." ADD026 (citations omitted). Yet the Court failed to apply the doctrine by imposing any conditions on Emigrant's relief, including crediting Pinti for her attorney's fees and requiring Emigrant to forgive the interest and attorney's fees it has charged Pinti since issuing the Discharge.

parties' respective equities and erred in finding that Pinti could be restored to her status quo. And certainly, Emigrant, as the moving party, did not meet its burden of proving as a matter of law that Pinti could be restored to the status quo ante. The district court should have considered the effect of Emigrant's "mistake" in balancing the parties' respective equities. *See United Fruit Co. v. United States*, 186 F.2d 890, 896 (1st Cir. 1951) (balancing parties' respective equities in case of unilateral mistake); *see also generally* 7 Corbin on Contracts § 28.37 (2021), stating that "[r]elief for mistake depends not only upon the materiality of the mistake, but also upon … [t]o what extent and at what cost can the status quo ante be restored?").

## IV. The District Court Erred in Dismissing Pinti's c. 93A Claim on Statute of Limitations Grounds

The district court also erred when it dismissed Pinti's counterclaim for unfair and deceptive business practices in violation of Mass. Gen. L. c. 93A based on statute of limitations grounds. As an initial matter, the district court erred by failing to consider that the statute of limitations was tolled by the discovery rule since Pinti only discovered Emigrant's wrongful conduct because of the January 11, 2019 ruling in the Pinti II case. EMC claimed all along during Pinti II that it was the owner of the Pinti Note and Pinti Mortgage and that the ESB-MH Assignment and FHLBNY Assignment were never delivered nor were they intended to be delivered. JA01299-JA01300; JA01953. Pinti could not have known prior to the January 11, 2019 decision in Pinti II that ESB-MH, not EMC, was the true owner of the Pinti Note

and Pinti Mortgage, so the statute of limitations was tolled by the discovery rule. *See Lambert v. Fleet Nat'l. Bank*, 449 Mass. 119, 865 N.E.2d 1091, 1097 (Mass. 2007) ("A four-year statute of limitations applies to G.L. c. 93A claims … Under the 'discovery rule,' this limitations period is subject to tolling until the plaintiff knew or should have known of the alleged injury."). Accordingly, Pinti's c. 93A claim is not barred by G.L. c. 93A's four-year statute of limitations.

Even assuming the discovery rule did not apply, the district court also erred by failing to acknowledge that—regardless of whether the statute of limitations may have passed (it did not)—Pinti can bring her c. 93A claim *defensively* in recoupment and/or setoff in response to Emigrant's claim.

Recoupment "allows a defendant to 'defend' against a claim by asserting -- up to the amount of the claim -- the defendant's own claim against the plaintiff growing out of the same transaction." *Bolduc v. Beal Bank, SSB*, 167 F.3d 667, 672 (1st Cir. 1999). There is no time limit to raise recoupment as a defense. *May v. SunTrust Mortg., Inc*., 467 Mass. 756, 765, 7 N.E.3d 1036, 1043 (2014) ("[T]he right to recoupment contains no time limitations on assertion of the right. This accords with the common-law understanding of recoupment as a defensive mechanism whereby a defendant may, at any time, assert claims against the plaintiff in reduction of the plaintiff's claims when those claims arise out of the same transaction; it is an offsetting of liabilities within a transaction." (alteration omitted) (*citing Bose Corp.*

*v. Consumers Union of U.S., Inc.*, 367 Mass. 424, 326 N.E.2d 8 (Mass. 1975))); *see also Bull v. United States*, 295 U.S. 247, 262, 55 S. Ct. 695, 79 L. Ed. 1421, 81 Ct. Cl. 974, 1935-1 C.B. 310 (1935) (explaining that recoupment is allowed "in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded [and that it] is never barred by the statute of limitations so long as the main action itself is timely"). Setoff is a "counter-claim demand which defendant holds against plaintiff, arising out of a transaction extrinsic of plaintiff's cause of action." *United Structures of America, Inc. v. G.R.G. Eng'g, S.E.*, 9 F.3d 996, 998 (1st Cir. 1993).

Pinti is entitled to the common law defense of recoupment (and setoff) against Emigrant because her c. 93A claim against Emigrant arises out of some feature of the transaction upon which Emigrant's action is grounded. In this regard, Emigrant alleges it is entitled to the equitable relief of striking the Discharge. Emigrant's claim is derived from the Pinti Mortgage and the Discharge. The Pinti Mortgage and the Discharge are what have brought Emigrant to file this action.

## CONCLUSION

The decision of the district court should be reversed. Costs should be taxed in favor of Pinti.

Respectfully submitted,

/s/ Eric E. Renner
Eric E. Renner  (Bar No. 1136562)
Duffy & Sweeney, Ltd.
321 South Main Street, Suite 400
Providence, RI  02903
Phone: 401-455-0700
Fax: 401-455-0701
erenner@duffysweeney.com


*Counsel for Appellant Linda S. Pinti*

Dated: September 9, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 28(a) and 32(a)(7), I hereby certify that this brief complies with the type-face limitations set forth in Fed. R. App. P. 32(a)(5)(A) and the type-style limitations set forth in Fed. R. App. P. 32(a)(6).  This brief contains 12,172 words, excluding those portions exempted by Fed. R. App. P. 32(f), as calculated by the word count feature of Word for Microsoft 365.  This motion was prepared in a proportionally spaced font, using Word for Microsoft 365, in 14-point Times New Roman.


/s/ Eric E. Renner
Eric E. Renner

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Memorandum and Order (ECF 120)
    filed December 18, 2023……………………….……………….……….....ADD001

Judgment (ECF 123)
    filed March 29, 2024……………………………………………………ADD036

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **EMIGRANT RESIDENTIAL LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19-cv-12258-DJC** |
| | ) | |
| **LINDA S. PINTI, LESLEY R. PHILLIPS,** | ) | |
| and any and all occupants, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

CASPER, J.                                                                December 18, 2023

**I.     Introduction**

Plaintiff Emigrant Residential LLC ("Emigrant") has sued Defendants Linda S. Pinti ("Pinti"), Lesley R. Phillips ("Phillips") and any and all occupants of a property located at 1643 Cambridge Street #52, Cambridge, MA ("the Property") (collectively, "Defendants") seeking a declaratory judgment to strike the discharge of mortgage from title of the Property.   D. 1. Defendants counterclaimed that Emigrant perpetrated fraud on the Court, engaged in unfair and deceptive business practices in violation of Mass. Gen. L. c. 93A, and intentionally and negligently inflicted emotional distress.   D. 20.   After remand from the First Circuit, allowing Defendants additional discovery in two areas and permitting the parties to supplement their briefing, the Court ALLOWS the motion for summary judgment, D. 28, filed by Emigrant on its claims and Defendants' counterclaims for the reasons stated below.

1

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute regarding any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that "carries with it the potential to affect the outcome of the suit under the applicable law."  García-González v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014) (quoting Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36 (1st Cir. 2014)) (internal quotation mark omitted).  The moving party "bears the burden of demonstrating the absence of a genuine issue of material fact."  Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (citation omitted).  Once that burden is met, the non-moving party may not rest on the allegations or denials in its pleadings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citation omitted).  Instead, "with respect to each issue on which [it] would bear the burden of proof at trial," the non-moving party must "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor."  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citations omitted).  The Court views the record in the light most favorable to the non-moving party, "drawing reasonable inferences" in its favor.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted).  "Conclusory allegations, improbable inferences, and unsupported speculation," however, are "insufficient to establish a genuine dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (citation and internal quotation marks omitted).

## III.     Factual Background

The following facts, which are undisputed unless otherwise noted, are drawn from Emigrant's statement of material facts, D. 30, Defendants' response to the same and Defendants' statement of additional material facts, D. 45-5, Emigrant's response thereto, D. 47, Defendants'

supplemental response and statement of facts, D. 111, Emigrant's response to the supplemental statement of facts, D. 117, and the exhibits referenced in these documents.

### A.   Default of Pinti Mortgage and Note

Pinti and Phillips have lived in the Property since the 1980s.  D. 117 ¶¶ 67–68.  On March 13, 2008, Pinti and Phillips executed and delivered a promissory note to Emigrant Mortgage Company, Inc. ("EMC") for $160,000.00 ("Pinti Note") as part of refinancing a home equity loan. D. 45-5 ¶ 1; D. 117 ¶ 69.  On that same date, Pinti and Phillips provided a mortgage ("Pinti Mortgage") on the Property to EMC to secure the Pinti Note and recorded it with the Middlesex County (Southern District) Registry of Deeds.  D. 45-5 ¶ 3; D. 117 ¶ 69.

Roughly eighteen months later, on August 1, 2009, Defendants defaulted on the Pinti Note by failing to make payment and failed to make all subsequent payments thereafter.  D. 45-5 ¶ 4; D. 117 ¶ 71.  EMC sent Defendants a 90-day notice of right to cure on September 29, 2009.  D. 45-5 ¶ 5; see D. 31-1 at 31.

### B.   Relationship Between EMC, ESB-MH, Emigrant, and FHLBNY

On November 30, 2009, EMC assigned the Pinti Mortgage to ESB-MH Holdings, LLC ("ESB-MH") and recorded it with the Middlesex County (Southern District) Registry of Deeds on September 30, 2019 ("ESB-MH Assignment").  D. 45-5 ¶ 6; D. 117 ¶ 75.  Plaintiff Emigrant is the successor-by-merger to ESB-MH.  D. 45-5 ¶ 7; D. 117 ¶ 76; see D. 31-1 at 36–39.  On the same day as the ESB-MH Assignment, ESB-MH executed an assignment of the Pinti Mortgage to Federal Home Loan Bank of New York ("FHLBNY"), but did not immediately deliver the assignment to FHLBNY ("FHLBNY Assignment").  D. 45-5 ¶¶ 8–9; D. 117 ¶ 77.

As to FHLBNY's relationship with the various Emigrant entities, the Court notes the following.  Emigrant Savings Bank ("Emigrant Bank") is the parent of Emigrant.  D. 117 ¶ 78.  On

December 1999, FHLBNY and Emigrant Bank entered into the Advances, Collateral Pledge and Security Agreement ("Advances Agreement").  D. 117 ¶ 79.  The Advances Agreement provides that as security for loans that FHLBNY may advance to Emigrant Bank, Emigrant Bank "hereby assigns, transfers, and pledges to [FHLBNY], and grants to [FHLBNY] a security interest in all of the Capital Stock, Mortgage Collateral, Securities Collateral and Other Collateral."  D. 117 ¶ 80; see D. 112-3 at 5.  Mortgage Collateral is defined to include "first mortgages and deeds of trust . . . and all notes, bonds or other instruments evidencing loans secured thereby."  D. 117 ¶¶ 80–81; D. 112-3 at 3.  The Advances Agreement gives FHLBNY certain rights over the Mortgage Collateral and Emigrant Bank certain responsibilities regarding maintenance of the collateral.  D. 117 ¶¶ 82–88; D. 112-3 at 5–9, 11.

On April 7, 2008, roughly a month after the Pinti Note and Mortgage were executed, ESB-MH, Emigrant Bank and FHLBNY executed the Subsidiary/Affiliate Collateral Pledge and Security Agreement ("Pledge Agreement").  D. 117 ¶ 89.  The Pledge Agreement acted as an extension of the Advances Agreement, wherein ESB-MH, as an affiliate of Emigrant Bank, agreed to "pledge certain of its property as collateral to" FHLBNY.  D. 112-5 at 2; D. 117 ¶ 91. Under the Pledge Agreement, ESB-MH "hereby assign[ed], transfer[ed] and pledge[d] to [FHLBNY], and grant[ed] to [FHLBNY] a security interest in, those certain instruments (and the related mortgages), securities and other property which are: (i) specifically listed and identified in Attachment 'A' hereto."  D. 112-5 at 2–3; see D. 117 ¶ 90.  The Pledge Agreement further provided that Attachment A could be substituted from time to time and, much like the Advances Agreement, set forth FHLBNY's rights and ESB-MH's responsibilities with regard to the collateral pledged. D. 112-5 at 3–6; see D. 117 ¶ 92.

4

In a letter dated August 4, 2009, FHLBNY informed Emigrant Bank that it had "moved Emigrant [Bank] to the Listing & Segregation II collateral category for all its mortgage collateral" ("Category Change Letter").  Id. ¶¶ 97–98; D. 112-9 at 2.  The letter indicated that "the process is to be completed within ninety days or Friday, October 30, 2009."  D. 117 ¶ 98; D. 112-9 at 2.  The Listing & Segregation II collateral category imposed (on Emigrant Bank and its subsidiaries, including ESB-MH) certain requirements for maintaining collateral as outlined in the Delivery of Mortgage Collateral Procedures document ("Delivery Procedures"), D. 112-9 at 2, 4–25, and FHLBNY's Member Products Guide ("Products Guide"), D. 112-10; D. 118-1 at 101–10.  D. 117 ¶¶ 99–100.  These requirements included endorsing promissory notes in blank and preparing individual mortgage assignments to FHLBNY in recordable form.  D. 117 ¶ 101; see 112-9 at 5–6; D. 112-10 at 4–5.  ESB-MH was also required to stamp loan files as assigned to FHLBNY and maintain said files in a segregated vault or storage area marked "Federal Home Loan Bank of New York."  D. 117 ¶¶ 102–103.

As of August 2009, Emigrant Bank was borrowing money from FHLBNY and ESB-MH intended to comply with these obligations.  D. 117 ¶ 104.  Between November 2009 and January 2010, "ESB-MH prepared mortgage assignments and note allonges for Mortgage Collateral pledged or to be pledged as security for loans from FHLBNY."  Id. ¶ 106.  Emigrant disputes, however, that as of November 2009 ESB-MH was still pledging mortgage loans as collateral and asserts that it had elected to pledge securities instead.  Id. ¶¶ 80, 82–88, 90–93, 95–103, 105, 109.  Setting aside whether Pinti Note and Mortgage were already pledged, intended to be pledged, or simply swept into a larger project wherein even loans that did not qualify as collateral under the Products Guide were prepared, see id. ¶¶ 106–07, 110–11; D. 112-4 at 11, it is undisputed that

ESB-MH endorsed the Pinti Note in blank and executed the FHLBNY Assignment on November 30, 2009.  Id. ¶ 107.

C.      **Attempted Foreclosure Sale on the Property**

Defendants failed to cure their default by December 28, 2009, the expiration date of the 90-day notice of right to cure, and EMC initiated foreclosure proceedings on the Property.  D. 45-5 ¶ 10; D. 117 ¶ 113.  Pinti filed for Chapter 7 bankruptcy and obtained a discharge on February 4, 2011.  D. 45-5 ¶ 11–12; D. 117 ¶ 114.  On August 22, 2011, EMC served a written response ("QWR Response") to a qualified written request from the Defendants seeking information pertaining to the ownership of the Pinti Mortgage pursuant to 12 U.S.C. § 2605(e).  D. 45-5 ¶ 13; D. 117 ¶ 115.  The QWR Response named ESB-MH as the owner of the loan and EMC as the servicer of the loan and further explained that the ESB-MH Assignment was not recorded.  D. 117 ¶ 116; see D. 31-1 at 42.   It also stated that the Pinti Note, Pinti Mortgage, ESB-MH Assignment were in the possession of EMC.  D. 117 ¶ 116; see D. 31-1 at 42.  About a year later, on August 9, 2012, EMC sold the Property to Harold Wilion ("Wilion") for $260,000 and recorded the foreclosure deed with the Middlesex County (Southern District) Registry of Deeds.  D. 45-5 ¶¶ 14-16; 19; D. 117 ¶ 118.

EMC's assistant treasurer, Joel Marcano ("Marcano") attests that under "EMC's established loan servicing policies and procedures" when EMC receives foreclosure sale proceeds from a third-party purchaser following a foreclosure sale, EMC's loan servicing department prepares a memorandum to EMC's loan payoff department.  D. 31 ¶ 18.  The memorandum states the amount of the funds received, confirms that the funds were received following a foreclosure sale to a third party and instructs that the loan payoff department should not prepare a discharge of mortgage.  Id.  Marcano also attests that neither EMC nor Emigrant has ever had a policy of

6

providing a discharge of mortgage to a borrower upon receiving proceeds from a third-party purchaser following a foreclosure.  Id. ¶ 19.

On September 18, 2012, Anna Sorvillo, an EMC employee at the time, prepared a memorandum for another EMC employee, Juan Minier ("Minier") attaching the $260,000.00 check from the Wilion foreclosure sale and identifying said check as "the amount of a Third Party Sale to payoff this loan" ("Payoff Memo").  D. 31-1 at 94; see D. 117 ¶ 119.   The memorandum did not state that the funds were received following a foreclosure on the Property nor did it discuss whether Minier should prepare a discharge of the Pinti Mortgage.  D. 31-1 at 94.  Nonetheless, on October 3, 2012, EMC prepared a discharge of the Pinti Mortgage ("Discharge") and sent it to Defendants for recording.  D. 117 ¶ 120; see D. 31-1 at 99–100.  Marcano attests that EMC staff prepared the Discharge by mistake as a result of the Payoff Memo's "fail[ure] to properly inform Minier that a Discharge of Mortgage should not be prepared" and "a misunderstanding . . . as to how the foreclosure sale proceeds were to be applied to the Pinti Mortgage Loan."  D. 31 ¶¶ 25–27.   Neither EMC nor Emigrant have returned the Pinti Note, cancelled or otherwise, to Defendants.  Id. ¶ 28, D. 45-5 ¶ 28.

**D.  Pinti I**

On October 29, 2012, Wilion filed a summary process action in state court against the Defendants for possession of the Property.  D. 45-5 ¶ 30; D. 117 ¶ 122.  In response, Defendants filed a separate litigation in state court against Wilion and EMC, challenging the foreclosure sale.  D. 45-5 ¶ 31.  On November 7, 2013, the state court found in favor of Wilion and EMC and the case was appealed.  Id. ¶¶ 32–34; D. 117 ¶¶ 123–24.  During the pendency of the state court litigation, Defendants made monthly $2000 use and occupancy payments to Wilion, part of which were used to satisfy condo fees, and have since continued to pay condo fees.  D. 117 ¶ 129–30.

7

On July 17, 2015, the Massachusetts Supreme Judicial Court ("SJC") ruled that the foreclosure sale was void because EMC's notice of right to cure failed to strictly comply with the notice provisions set forth in the Pinti Mortgage.  D. 45-5 ¶¶ 34-35; D. 117 ¶ 124–125; <u>Pinti v. Emigrant Mortg. Co., Inc.</u>, 472 Mass. 226, 233–38 (2015) ("<u>Pinti I</u>").  In light of this decision, Emigrant returned the foreclosure sale proceeds to Wilion.  D. 45-5 ¶ 39; D. 117 ¶ 126.  Since <u>Pinti I</u>, EMC paid bi-annual real estate taxes to the City of Cambridge.  D. 45-5 ¶ 41.

Within a few days of the <u>Pinti I</u> decision, Pinti discovered the Discharge within an envelope that she had previously overlooked.  D. 45-3 ¶ 16.  On July 29, 2015, two weeks after <u>Pinti I</u>, Pinti recorded the Discharge with the Middlesex County (Southern District) Registry of Deeds.  D. 45-5 ¶ 38; D. 117 ¶ 127.  Defendants, however, have not exercised their right of redemption in the Property by satisfying the total debt owed under the terms of the loan.  D. 45-5 ¶ 42.  On or about December 30, 2015, EMC sent the original Pinti Note and the originally recorded Pinti Mortgage to Emigrant's counsel.  D. 32 ¶ 14.

### E.    <u>Pinti II</u>

On June 17, 2016, EMC sued Defendants in another session of this Court (Wolf, J.) seeking, *inter alia*, a declaratory judgment striking the Discharge from title to the Property.  D. 45-5 ¶ 46; D. 117 ¶ 131; <u>see</u> <u>Emigrant Mortg. Co., Inc. v. Pinti</u>, 16-cv-11136-MLW (D. Mass. Jan. 17, 2019) ("<u>Pinti II</u>").  Defendants asserted counterclaims, seeking a declaratory judgment that Defendants owned the Property free of any mortgage, as well as a claim for negligent infliction of emotional distress.  <u>Pinti II</u>, D. 30.  EMC moved for summary judgment on its claim and Defendants' counterclaims.  D. 117 ¶ 133; <u>Pinti II</u>, D. 35.  The Court allowed EMC's motion with respect to Defendants' counterclaim for negligent infliction of emotional distress, but otherwise denied it without prejudice.  D. 117 ¶ 134; <u>Pinti II</u>, D. 54.  After a bench trial, D. 117 ¶ 135; <u>see</u>

Pinti II, D. 105, 108, 112-13, the Court (Wolf, J.) dismissed the case "because plaintiff [EMC] lacks standing." D. 117 ¶ 136; Pinti II, D. 109. In Pinti II, the Defendants argued that EMC was not the mortgagee on August 9, 2012 because the Pinti Mortgage had been assigned to ESB-MH. Pinti II, D. 45 at 19–20. The Court agreed, ruling that EMC was not the mortgagee of the loan in August 2012 because the Pinti Note had been previously assigned to ESB-MH and that ESB-MH did not reassign it to EMC. D. 117 ¶ 137; Pinti II, D. 110 at 5-6, 8. Thus, the Court dismissed EMC's action without prejudice, holding that "ESB-MH was the mortgagee on August 9, 2012. EMC was not the proper entity to attempt to foreclose by entry." D. 45-5 ¶ 60; Pinti II, D. 110 at 17, 20.

EMC moved for reconsideration of the Court's order dismissing its claim to strike the Discharge, arguing that it is the real party in interest under a subservicing agreement that authorized it to commence proceedings on behalf of ESB-MH and required Emigrant to indemnify ESB-MH for certain losses. D. 45-5 ¶ 61; D. 117 ¶ 138; Pinti II, D. 115-16. The Court denied the motion because EMC had not raised this argument at trial. D. 117 ¶ 139; Pinti II, D. 121 at 4, 7. The Court, moreover, stated that the holder of the Pinti Note could seek to strike the allegedly mistaken discharge of the Pinti Mortgage. Pinti II, D. 121 at 7; see D. 117 ¶ 140.

### F.    Post Pinti-II Emigrant Assignment

After the Court's ruling in Pinti II, Emigrant reached out to FHLBNY in an effort to address issues raised regarding FHLBNY Assignment. D. 117 ¶¶ 142, 143. On June 24, 2019, FHLBNY executed and emailed to Emigrant an assignment of the Pinti Mortgage back to Emigrant ("Emigrant Assignment"). D. 117 ¶ 144. On September 30, 2019, Emigrant recorded both the 2009 and FHLBNY Assignment in the Middlesex County (Southern District) Registry of Deeds. Id. ¶¶ 146–47.

During this time, FHLBNY and Emigrant also negotiated the language of a letter expressing FHLBNY's position as to assignments that were prepared by ESB-MH in 2009.  Id. ¶¶ 143, 145.  On January 15, 2020, FHLBNY sent a letter to Emigrant stating that "[o]n the date of this letter . . . the signed Assignments of Mortgage for the Subject Loans, naming FHLBNY a assignee are null and void."  D. 112-17 at 3.  The loan number for the Pinti Mortgage is listed as one of the Subject Loans.  Id. at 8; see D. 112-4 at 36.

## IV.   Procedural History

Emigrant filed its complaint in this case on November 4, 2019.  D. 1.  After the Court denied Defendants' motion to dismiss, D. 13, Defendants filed an answer with counterclaims against Emigrant.  D. 20.  Emigrant moved for summary judgment on its declaratory judgment claim and Defendants' counterclaims.  D. 28.  In response, Defendants moved for discovery under Fed. R. Civ. P. 56(d), D. 35, which this Court denied.  D. 43.  On March 24, 2021, this Court allowed Emigrant's motion for summary judgment.  D. 61.  On Defendants' appeal, the First Circuit affirmed in part and reversed in part this Court's decision on the motion for discovery, vacated the order allowing the motion for summary judgment and remanded the case for limited discovery regarding "the chain of custody and authenticity of the Note" and "the 2019 assignments" and supplemental briefing.  D. 85.  On remand, the parties have engaged in discovery and submitted supplemental briefs.  D. 110; D. 116.  The Court heard the parties on the summary judgment motion and took the matter under advisement. D. 119.

## V.   Discussion

The First Circuit vacated this Court's prior order on Emigrant's motion for summary judgment, D. 61, without examining the merits of the parties' claims.  D. 84 at 11.  Where the parties' supplemental briefs do not raise new arguments or present new evidence relating to certain

10

issues, the Court's analysis is largely unchanged.  As to new arguments and evidence, however, the Court has considered the discovery and supplemental briefing.  As to all issues, this Court has decided the summary judgment motion, D. 28, anew.

### A.     Emigrant's Claim Is Not Barred by *Res Judicata*

Defendants argue that Emigrant's claim is barred by the doctrine of *res judicata* because in Pinti II, EMC "failed to bring up the fact that they had standing to challenge the discharge as the servicer under the mortgage." D. 45-1 at 3.  Defendants further assert that EMC's failure "forever waived their rights to reinstate the mortgage." Id.  A claim is precluded under *res judicata* if there is "(1) a final judgment on the merits in an earlier action; (2) sufficient identity between the causes of action asserted in the earlier and later suits; and (3) sufficient identity between the parties in the two suits." Bay State HMO Mgmt., Inc. v. Tingley Sys., Inc., 181 F.3d 174, 177 (1st Cir. 1999).

Defendants' argument fails on the first prong because there was no final judgment on the merits in an earlier action.  The Court in Pinti II dismissed EMC's claim because EMC lacked standing. Pinti II, D. 109.  "The standing inquiry does not focus on the merits of the dispute.  It focuses only on whether the litigant is entitled to have the court decide the merits of the dispute." City of Hope Nat. Med. Ctr. V. HealthPlus, Inc., 156 F.3d 223, 228 (1st Cir. 1998) (internal quotation marks omitted) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).  Given that the Court did not reach the merits, Emigrant's claims are not barred by *res judicata*. See McCarney v. Ford Motor Co., 657 F.2d 230, 234 (8th Cir. 1981) (ruling that "a dismissal based upon a lack of standing is not 'on the merits' of the underlying substantive claim and is not a bar to asserting another theory of relief based upon the same operative facts assuming the other elements of claim preclusion are satisfied").

This is particularly true here where the Court in <u>Pinti II</u>, dismissed EMC's claims without prejudice.  <u>See O'Connell v. Gross</u>, No. 19-11654-FDS, 2020 WL 1821832, at *4 n.3 (D. Mass. Apr. 10, 2020) (noting that even if prior court had reached substantive issues, claim preclusion was not applicable where prior complaint was dismissed without prejudice).  In fact, the Court in <u>Pinti II</u> expressly stated that its decision was not a final adjudication on the issue, noting that "a new case can be filed by the party or parties with standing to contest the discharge of the mortgage. It is likely that another case will be filed by the noteholder to foreclose.  It appears that the noteholder—or if [EMC] has standing, the noteholder and [EMC]—could in that case, or another, again seek to strike the allegedly mistaken discharge of the mortgage." <u>Pinti II</u>, D. 121 at 7. Accordingly, the Court concludes that Emigrant's claims are not barred by <i>res judicata</i> because <u>Pinti II</u> does not constitute a final adjudication on the merits.

### B.      <u>Emigrant Has Established Standing to Strike the Discharge of Mortgage</u>

The term "mortgagee" refers to a person or entity holding the mortgage and either holding the mortgage note or acting on behalf of the note holder.  <u>Eaton v. Fed. Nat'l Mortg. Ass'n</u>, 462 Mass. 569, 571 (2012).  The mortgagee is entitled to foreclose on the secured property in the event of default.  <u>Id.</u> at 579–80.  Before initiating a foreclosure, however, the mortgagee must hold the mortgage pursuant to a valid written assignment and be able to provide proof of such.  <u>See</u> <u>U.S. Bank Nat'l Ass'n v. Ibanez</u>, 458 Mass. 637, 649–53 (2011).

In their supplemental brief, Defendants assert that Emigrant lacks standing to bring this action because Emigrant is not the mortgagee.  D. 110 at 2.  In short, Defendants argue that ESB-MH transferred the Pinti Note and Pinti Mortgage to the FHLBNY sometime in 2008 or 2009 and that any transfer back to Emigrant in 2019 was void because the Pinti Mortgage had been discharged.  <u>Id.</u>  Emigrant replies that it need only establish that it is the holder of the Pinti Note,

because it seeks to strike the Discharge, rather than foreclose.  D. 116 at 10 (citing Pinti II, D. 121 at 7).  Emigrant further argues that even if the Pinti Mortgage had been delivered to FHLBNY in 2009, FHLBNY assigned the Pinti Mortgage back to Emigrant in 2019.  Id. at 2.

The Court begins with the ownership of the Pinti Note.  Defendants originally executed the Pinti Note in favor of EMC on March 13, 2008 alongside the Pinti Mortgage.  D. 31-1 at 1.  On November 30, 2009, the Pinti Note was then endorsed by EMC in favor of ESB-MH.  D. 31-1 at 7; D. 45-2 at 217–18; see Pinti II, D. 110 at 6, 14 (concluding that ESB-MH was the owner of the Pinti Note as of November 30, 2009).  Emigrant merged with ESB-MH in March 2013.  D. 31-1 at 36–39.

Defendants assert that sometime in 2008 or 2009 prior to the Emigrant and ESB-MH merger, ESB-MH transferred ownership of the Pinti Note (and assigned the Pinti Mortgage) to FHLBNY under the terms of the Advances Agreement and the Pledge Agreement.  D. 110 at 4. As an initial matter, the Court rejects Defendants' assertion that "ESB-MH (Emigrant's predecessor) transferred the Pinti Note and Pinti Mortgage to FHLBNY in April 2008" when the Pledge Agreement was executed.  Id.  It is undisputed that the Pinti Note and Mortgage were not transferred from EMC to ESB-MH until November 30, 2009.  D. 45-5 ¶¶ 6, 61; D. 117 ¶¶ 75; see D. 45-2 at 217–18; Pinti II, D. 110 at 6, 13–14.  ESB-MH did not own the Pinti Note and Mortgage prior to that date and could not have transferred any interest in those instruments to FHLBNY. See Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 291 (1st Cir. 2013).

Several months after receiving the August 4, 2009 Category Change Letter, Emigrant endorsed the Pinti Note in blank.  D. 117 ¶ 107.  As a result of this endorsement, the Pinti Note is held by whichever entity possessed it.  Mass. Gen. L. c, 106, § 3-205(b) (providing that instrument "indorsed in blank . . . may be negotiated by transfer of possession alone"); see Deutsche Bank

Nat. Tr. Co. v. Lefebvre, 90 Mass. App. Ct. 1104, 2016 WL 4536285, at *2–3 (2016) (unpublished decision) (ruling that bank that possessed endorsed-in-blank note was owner).  Despite being granted the opportunity on remand to conduct additional discovery into the matter, Defendants have not adduced any evidence controverting that the authentic Note is in Emigrant's possession.  See D. 45-5 ¶ 45.  The undisputed record shows that the Pinti Note has been in Emigrant's possession (via its counsel) since the start of this litigation.  D. 118 ¶¶ 9–11; D. 112-8 at 6.  Thus Emigrant is the holder and owner of the Pinti Note.

Defendants make various arguments about the transfer of the Pinti Note based on the rights of FHLBNY and obligations of ESB-MH and Emigrant Bank under the terms of the Advances Agreement, Pledge Agreement and Products Guide which required, *inter alia*, the documents protecting FHLBNY's security interest to be marked as assigned to FHLBNY, kept in a "segregated area" and gave FHLBNY the contractual right to take physical possession of the Pinti Note.  D. 117 ¶¶ 82, 92, 102–03, 107–08.  While these contractual rights and obligations are unambiguous, the undisputed evidence in the record shows that FHLBNY never took physical possession of the Pinti Note.  D. 112-2 at 24 (testifying that Pinti Note was in ESB-MH's vault); D. 112-4 at 37 (testifying that FHLBNY never removed "the Pinti collateral from the Emigrant vault or the Emigrant offices in general").  The evidence also indicates that although ESB-MH was taking steps to comply with the requirements of Listing & Segregation II, ESB-MH never in fact met those requirements because it ultimately decided not to follow-through with the project.  D. 112-4 at 14–15, 22–23; D. 112-6 at 18; D. 112-7 at 13; D. 112-12; D. 112-13; D. 118 ¶ 13.  Even if the Court inferred in Defendants' favor that at some point the Pinti Note was transferred to FHLBNY as part of the Pledge Agreement or Advances Agreement, this would not negate the fact

14

that the Note is endorsed in blank and has been in the physical possession of Emigrant's agent since before Emigrant initiated this litigation.  D. 118 ¶¶ 9–11; D. 112-8 at 6; <u>see</u> D. 45-5 ¶ 45.

As to the Pinti Mortgage, the parties dispute whether the FHLBNY Assignment was delivered in 2009, as collateral under the Pledge Agreement, or in 2019, as part of Emigrant's attempts to clarify its chain of title prior to filing the present lawsuit.  D. 110 at 10 (arguing that assignment was delivered on November 30, 2009 based on the "plain language of the Advances Agreement and the Pledge Agreement, coupled with the August 4, 2009 letter and Member Product Guide"); D. 116 at 5 (asserting that FHLBNY assignment was delivered on June 4, 2019 (citing D. 112-4 at 36)); D. 117 ¶ 97 (arguing that Pinti loan was 'more than 60 days delinquent as of November 2009" and thus  "no longer eligible to be pledged as collateral" pursuant to Member Products Guide).   For the purposes of the present motion, the Court assumes, without deciding, in Defendants' favor, that before the Discharge was issued, ESB-MH transferred the Pinti Mortgage to FHLBNY.  <u>See</u> D. 110 at 10.  Even with this assumption, if the Emigrant Assignment executed by FHLBNY on June 24, 2019 was effective, then regardless of when the Pinti Mortgage previously was assigned to FHLBNY, Emigrant became the mortgage holder prior to initiating this litigation.

Despite the opportunity for discovery on remand, Defendants adduced no evidence as to the 2019 Emigrant Assignment and continue to argue that the assignment was void because the Discharge then left "nothing to assign," D. 110 at 4, D. 45-1 at 4, an argument the Court previously rejected, D. 61 at 10.  Emigrant contends that its status as a noteholder is sufficient to establish standing to strike the mistaken discharge.  D. 116 at 2–3 (citing <u>Pinti II</u>, D. 121 at 7 (stating that "[i]t appears that the noteholder . . . could in that case, or another, again seek to strike the allegedly mistaken discharge of the mortgage")).  That is, that it has a personal stake in striking the Discharge

so that it can enforce its rights under the Pinti Note.  See Baker v. Carr, 369 U.S. 186, 204 (1962); Mass. Ass'n of Indep. Ins. Agents & Brokers, Inc. v. Comm'r of Ins., 373 Mass. 290, 292 (1977).

In Gleason v. Dorney, the Supreme Judicial Court ("SJC") held that discharge of a mortgage "extinguished" the mortgage and a subsequent assignment "was a nullity, for the bank at that time had nothing to assign." Gleason v. Dorney, 332 Mass. 646, 648 (1955).  The SJC acknowledged, however, the line of Massachusetts cases wherein "equity will set aside" a discharge made by mistake and emphasized that there were "no findings of mistake or of any other facts that would entitle the [bank] to equitable relief" in that case.  Id.  That is, although a discharge typically extinguishes the mortgage, where the discharge was made by mistake, the former mortgage-holder is not stripped of standing to seek equitable relief striking the discharge.  While no Massachusetts case explicitly states that ownership of the note alone establishes standing to strike a discharge, at least one Massachusetts court has allowed the party who holds the note and a post-discharge assignment of mortgage to strike a discharge erroneously issued by its predecessor.  U.S. Bank Nat'l Ass'n v. Twomey, No. MICV200905070F, 2012 WL 2335295, at *1, 4–5 (Mass. Super. May 23, 2012), aff'd, 83 Mass. App. Ct. 1130 (2013) (granting U.S. Bank's request that discharge recorded on January 26, 2006 be stricken, where U.S. Bank possessed original promissory note endorsed in blank but did not receive formal assignment of mortgage until December 17, 2009).

The Court concludes that as the bearer of the Pinti Note and the assignee of the 2019 Emigrant Assignment, Emigrant has standing to seek cancellation of the allegedly erroneous Discharge.

16

### C.   <u>Emigrant Has Established That the Mortgage Was Discharged in Error</u>

"It is the general rule that, where a mortgage has been discharged by mistake, equity will set the discharge aside and reinstate the mortgage to the position the parties intended it to occupy, where the rights of intervening lienors have not been affected." <u>North Easton Co-op. Bank v. MacLean</u>, 300 Mass. 285, 292 (1938); <u>see</u> <u>Provident Coop. Bank v. James Talcott, Inc</u>., 358 Mass. 180, 189-90 (1970); <u>E. Bos. Sav. Bank v. Ogan</u>, 428 Mass. 327, 329–32 (1998).  Mistakes include misunderstandings of the facts surrounding the transaction at issue as well as administrative and clerical errors.  <u>See</u> <u>James Talcott, Inc.</u>, 358 Mass. at 183, 189 (affirming that mortgage was discharged by mistake where lender's attorney failed to discover intervening lien during title search); <u>Wells Fargo Home Mortg., Inc. v. Foley</u>, No. 298686(CWT), 2007 WL 2285809, at *3 (Mass. Land Ct. Aug. 10, 2007) (striking discharge entered by Wells Fargo due to "administrative mistake").

Here, the record establishes that the Discharge occurred due to an administrative error. Defendants do not assert that their mortgage loan was somehow paid off or that there was some other basis for the Discharge.  <u>See</u> D. 45-5 ¶ 42; D. 112-1 ¶ 4; D. 117 ¶ 71; <u>Foley</u>, 2007 WL 2285809, at *3 (reinstating mortgage that had not been paid off where no intervening lienor would be prejudiced).  As evidence of how the mistake occurred, Emigrant provides a sworn affidavit from Marcano averring that "EMC inadvertently prepared a discharge of the Pinti Mortgage" because EMC's September 18, 2012 memorandum "failed to properly inform Minier that a Discharge of Mortgage should not be prepared and sent to the Defendants."  D. 31 ¶¶ 25–27. Marcano further avers that EMC has a policy of instructing its loan servicing department not to prepare a discharge following a third-party foreclosure sale.  D. 31 ¶ 18.

17

Defendants argue that Marcano lacked personal knowledge for his testimony, that he testified as to Emigrant's policies and procedures despite being EMC's deponent and employee and that any statements made regarding EMC's policies and procedures are inadmissible hearsay because he did not attach them to his affidavit.  D. 110 at 12–14; see D. 45-5 ¶ 25 (disputing that the Discharge was a mistake on basis that Marcano was "merely speculating" that the "discharge was made in error" and arguing that Marcano's affidavit is "self-serving hearsay" and relies on no business records prepared prior to the September 18, 2012 memorandum).

 "A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." Cadle Co. v. Hayes, 116 F.3d 957, 961 n. 5 (1st Cir. 1997); see Hays v. Jefferson Capital Systems, LLC, No. 15-cv-14025-GAO, 2017 WL 449590, at *2 (D. Mass. Feb. 2, 2017) (citing Wallace Motor Sales, Inc. v. Am. Motors Sales Corp., 780 F.2d 1049, 1061 (1st Cir. 1985); and Schwartz v. CACH, LLC, No. 13-12644-FDS, 2014 WL 298107, at *2 n.2 (D. Mass. Jan. 27, 2014) (considering affidavit where affiant had custodial responsibilities and personal knowledge regarding business records)).

Here, Marcano avers that his affidavit is made based on his "personal knowledge" and "upon review of the servicing records for the subject property, which records were made and maintained in the regular or ordinary course of business of EMC."  D. 31 ¶ 3.  Defendants argue that Marcano cannot attest to "EMC's established loan servicing policies and procedures" without attaching any record of the same to the affidavit.  D. 110 at 12; D. 31 ¶ 18.  Marcano's affidavit makes clear that he is relying upon his personal knowledge and observations of EMC's policies and practices in his role as Assistant Treasurer in the foreclosure department since 2007.  D. 31 ¶¶ 1, 3; D. 45-2 at 171.

18

The Court also disagrees with Defendants' contention that Marcano lacked personal knowledge to aver that Emigrant, rather than his employer EMC, never "had a policy or preparing or otherwise providing a Discharge of Mortgage to a borrower upon receiving proceeds from a third-party purchaser following a foreclosure sale."  D. 110 at 13–14; D. 31 ¶ 19.  Under the terms of a subservicing agreement with Emigrant's predecessor-in-interest, EMC acted as Emigrant's servicer "on a group of loans," a role that includes preparing payoff documents.  See D. 45-2 at 435–36; id. at 171.  As an employee within EMC's foreclosure department, there is no basis here to question that Marcano would be aware if Emigrant routinely issued discharges for foreclosed loans, at least as to the group of loans serviced by EMC.  Moreover, the Defendants offer no evidence that Emigrant or ESB-MH would have intentionally directed the loan be discharged and no reasonable jury could find such intent where the Discharge contradicted the financial interests of EMC and Emigrant.  See Progressive Consumers, 79 F.3d at 1237.

Finally, Defendants point to a statement by Marcano in his deposition, "I believe [the Discharge] was created in error" for the proposition that Marcano lacked personal knowledge of the error.  D. 110 at 12 (citing D. 45-2 at 735).  Marcano's subsequent testimony shows that he based his belief upon review of a "memo that was provided along with the check to send to our Payoff Department for processing."  D. 45-2 at 735.  The Payoff Memo from Sorvillo to Minier, along with other documents related to the attempted foreclosure and discharge, was attached to Marcano's affidavit as business records.  D. 31; see Facey v. Dickhaut, 91 F. Supp. 3d 12, 20–21 (D. Mass. 2014) (ruling that affidavit could survive motion to strike "even when the declarant did not personally experience the matters discussed in the affidavit, but did review business or public records and included information from those records with the affidavit").  The Court will, therefore, rely upon Marcano's sworn statement to conclude that the Discharge was in error.  See

19

Cremaldi v. Wells Fargo Bank, No. 13-11767-MLW, 2017 WL 1190377, at *3 (D. Mass. Mar. 30, 2017) (finding sufficient foundation at summary judgment stage when affiant asserted that she was "familiar with the business records maintained by Wells Fargo for the purpose of servicing mortgage loans and [has] personal knowledge of the operations and the circumstances surrounding the preparation, maintenance and retrieval of records in Wells Fargo's recordkeeping systems" (alteration in original)).

Defendants further argue that Sorvillo's deposition testimony creates a factual dispute as to whether the Discharge was in error. D. 45-1 at 18; D. 45-5 ¶ 22; D. 110 at 14. First, Defendants argue that "Sorvillo testified that she did not believe that she made a mistake in preparing the memorandum that would have caused a discharge to be accidentally made." D. 110 at 14 (citing D. 45-2 at 684). As noted in the Court's prior decision, Sorvillo's subjective belief or intentions, however, are not at issue here, but rather the objective indications of corporate actors. D. 61 at 12. Moreover, Defendants misleadingly cite to a portion of Sorvillo's deposition testimony discussing a mistake concerning an unrelated August 2012 memorandum, rather than the September 2012 Payoff Memo. D. 45-2 at 683–86 (testifying as to potential errors that occurred in August when Sorvillo "did an REO acquisition" instead of a third-party sale); id. 709–12 (explaining that memorandum in August relating to REO acquisition was separate from September 18 memorandum to servicing department). With regard to the September Payoff Memo, Sorvillo testified that the person receiving the Payoff Memo could misunderstand the word "payoff" to mean an "actual payoff" or "full payoff," thus leading to an erroneous discharge. D. 45-2 at 714–16; see id. at 690 (testifying that "full payoff" would lead to discharge of a mortgage). Whether Sorvillo, or some recipient of the Payoff Memo, personally accepts blame for the mistake is irrelevant.

20

Second, Defendants argue that Sorvillo did not "recall[] any policies in place at EMC in 2012 regarding the preparation of such memoranda."  D. 110 at 14 (citing D. 45-2 at 694). Defendants' characterization of the record untenable.  As Emigrant points out, "Sorvillo testified that she 'wouldn't call them policies. Procedure or something, yes.'"  D. 116 at 16 (citing D. 45-2 at 694).

The Court concludes that Emigrant's continued possession of the unreleased Pinti Note is further evidence that the discharge was unintentional.  Defendants do not dispute that neither EMC nor Emigrant have returned the Pinti Note cancelled or otherwise to Defendants.  D. 45-5 ¶ 28. Nor do Defendants dispute that EMC has not otherwise marked the Pinti Note as satisfied.  D. 31 ¶ 27; see D. 45-5 ¶ 27.   The return of the Pinti Note may not be a "prerequisite for a valid discharge of the Pinti Mortgage."  See D. 110 at 15.  Cancellation of the mortgage note, however, typically accompanies discharge of a mortgage.  Cf. NationsBanc Mortg. Corp. v. Eisenhauer, 49 Mass. App. Ct. 727, 732 (2000) (affirming district judge's finding that discharge was not erroneous where mortgagors received cancelled note along with discharge and explaining that debtor's possession of cancelled note creates rebuttable presumption of discharge); Dickman v. McClellan, 302 Mass. 87, 88 (1939) (ruling that discharge of mortgage should be reformed to explicitly release liability on note).   At the very least, the non-cancellation of the Pinti Note is further evidence that the Discharge was issued through inadvertence rather than intent.

Defendants, with no supporting case law, argue that even if there was a mistake made, it was a unilateral mistake and thus Emigrant's remedy should be against EMC because EMC made the mistake.  D. 45-1 at 12.  While some Massachusetts cases refer to reformation of the mortgage contract based on the parties' mutual mistake, Massachusetts cases contemplate reinstating discharged mortgages even where there is no apparent fault or mistake on the part of the mortgagor.

21

Foley, 2007 WL 2285809, at *3 (striking discharge and recognizing that discharge was part of series of "obvious and repeated clerical and administrative errors on the part of Wells Fargo"); see United Fruit Co. v. United States, 186 F.2d 890, 895–96 (1st Cir. 1951) (holding that recission of mistakenly executed release "will not be denied . . . merely because the [plaintiff's] unilateral mistake may have been attributable in some sense to lack of care or diligence" where defendant never "changed its position in reliance on the release").

Defendants also argue that Emigrant is not entitled to a remedy because EMC's mistake was based on a "business decision" to act without retaining a Massachusetts attorney to advise it or hire a compliance officer for Massachusetts. D. 45-1 at 16-17. Even if Defendants had provided any legal support for this argument, id., the factual record does not indicate that the Discharge occurred due to any failure to comply with Massachusetts law, rather than simply misreading or mis-drafting of the Payoff Memo. D. 31 ¶¶ 25-27; D. 45-2 at 714–16.

No reasonable jury could find that EMC intentionally discharged the Pinti Mortgage on the uncontroverted record recited here. D. 31 ¶¶ 25–27; D. 45-2 at 714–16; D. 117 ¶ 119–20. Accordingly, the Court concludes, on an undisputed record, that the Discharge was issued by mistake.[1]

### D.   Emigrant Is Entitled to Recovery in Equity

Defendants argue that even if the Pinti Mortgage was discharged by mistake, Emigrant is not entitled to equity where (1) it acted with unclean hands and (2) Defendants cannot be restored to their *status quo ante* position. D. 110 at 18–21.

---

[1] Defendants' argument regarding unjust enrichment, D. 45-1 at 13, does not warrant a different conclusion. Emigrant has not brought a claim for unjust enrichment and notes that it "merely relies upon Defendants' unjust enrichment as evidence that the discharge of [the Pinti Mortgage] was recorded by mistake, and is not seeking money damages under an independent state law claim for unjust enrichment." D. 46 at 9.

22

### 1.   *Emigrant Did Not Act with Unclean Hands*

"The doctrine of unclean hands denies equitable relief 'to one tainted with the inequitableness or bad faith relative to the matter in which [he] seeks relief.'" Murphy v. Wachovia Bank of Del., N.A., 88 Mass. App. Ct. 9, 15 (2015) (quoting Fidelity Mgmt. & Rsch Co. v. Ostrander, 40 Mass. App. Ct. 195, 200 (1996)).  The doctrine "only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties."  Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 538 (1st Cir. 2015).  "Its purpose is to prevent a party from benefiting by his dishonesty."  Fisher v. Fisher, 349 Mass. 675, 677 (1965).  As such, it typically applies where a party engages in "willful misconduct" rather than "an inadvertent act or misapprehension of legal rights."  30A C.J.S. Equity § 118 (2023); see, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 815 (1945) (explaining that "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of" the unclean hands doctrine); Williams v. Arndt, 626 F. Supp. 571, 578 (D. Mass. 1985) (holding that unclean hands defense did not apply to copyright infringement claim where defendants could not "prove that any omission [in copyright application] was an intentional, knowing or purposeful concealment").

In their initial opposition, Defendants contend that "EMC acted with unclean hands when it told Defendants that they were the mortgage holder."  D. 45-1 at 10.  Defendants point to no evidence that EMC did not believe in good faith that it was the "holder and servicer of the loan" when it prepared its August 22, 2011 QWR Response, D. 45-2 at 311, or when it continued to litigate Pinti II.  Defendants also argue that Emigrant "cloud[ed] Defendants title by executing new assignments of a discharged mortgage" to manufacture standing and to deny discovery to Defendants.  D. 45-1 at 11.  Again, despite being accorded discovery regarding the 2019

23

assignments, Defendants have adduced no evidence that the assignments were fictitious.  The Court does not doubt, and indeed Emigrant does not contest, that the Emigrant Assignment was executed to bolster Emigrant's standing for this and future litigations, but it is unclear why this motive would amount to bad faith misconduct.  See D. 117 ¶ 143 (acknowledging that "Emigrant delivered the FHLBNY Assignment and sought a further Assignment of Mortgage from FHLBNY back to itself to address the Defendants' anticipated challenges to its standing in the context of the FHLBNY Assignment had the instrument been left unrecorded").

Defendants' supplemental opposition asserts that "EMC's preparation of the discharge might not in these circumstances have been a mere negligent mistake but rather, 'reckless, deliberate, unprofessional, incompetent, and possibly misfeasant.'" D. 110 at 19.   General observations about "EMC's shoddy business practices" do not, at this summary judgment stage, answer the merits of the relief that Emigrant seeks here.   D. 110 at 19; see Murphy, 88 Mass. App. Ct. at 16 (rejecting unclean hands defense where plaintiff's failure to disclose his interest in surplus funds was "unconnected" to his claim that Bank erroneously distributed funds).  Defendants fail to offer any evidence regarding recklessness, much less intentional misconduct, with regard to the Discharge.

First, to the extent that EMC's knowledge of its own mistake and failure to act on that knowledge in a timely manner would indicate bad faith, see D. 110 at 19, this case is distinguishable from Nat'l Lumber. There, the court denied equitable subrogation on summary judgment because evidence showed that the bank's attorney became aware of the junior lien before closing on refinancing, intended to seek a discharge or subordination from junior lienholder to ensure seniority of the refinanced mortgage, but for unknown reasons did not actually obtain the discharge or subordination.  Nat'l Lumber Co., 76 Mass. App. Ct. at 3, 7; cf. James Talcott, Inc.,

358 Mass. at 183 (granting equitable relief where attorney did not discover intervening lien during title search).  By contrast, here, Defendants have adduced no evidence that EMC became aware of the potential mistake in time to avert it.  Indeed, two representatives of EMC testified to their lack of knowledge regarding the mistaken Discharge.  D. 45-2 at 155, 252-53 (testifying that as vice president of loan administration, "didn't even know it existed"); D. 45-2 at 610 (testifying that as senior vice president and general counsel of Emigrant Savings Bank, could not recall being told about a mistakenly discharged note).

Second, Defendants argue the Court has not considered the "apparent thousands . . . of mortgage assignments that . . . have never, apparently, been accurately reflected in the recordings by EMC."  D. 110 at 19; see D. 117 ¶¶ 149–151 (describing destruction of some portion of mortgage assignments prepared in late 2009).  Even if the Court were to credit Defendants' position that "thousands" of mortgage assignments were prepared and left unrecorded for a bad-faith purpose, this would have no bearing on the merits of the equitable claim at issue, namely whether the Discharge may be stricken as issued by mistake.

Moreover, barring equitable relief in this case would not serve the doctrine's usual purpose of preventing a dishonest actor from benefiting from its own misconduct.  See Fisher, 349 Mass. at 677.  Here, the Discharge did not benefit Emigrant, but rather delayed its ability to foreclose on the Property and enforce its rights under the Pinti Note pending the resolution of Pinti II and the present matter.  Striking the Discharge will not convert those losses into a windfall.  For all of these reasons, the Court concludes that EMC did not act with unclean hands with regard to the Discharge.

2.      *Defendants Restored to Their Pre-Discharge Position*

Defendants argue that rescinding the Discharge is inappropriate where Defendants cannot be restored to their original, pre-Discharge position.  D. 110 at 20.  Defendants list the following expenses, which they assert exceed the amount owed under the Pinti Note, as evidence of their changed position:  (1) attorneys' fees "in excess of $150,000" across "three separate cases;" (2) condo fees paid after the Discharge; (3) entry into a "settlement with their condo association based on the mortgage having been discharged" and (4) use and occupancy payments to Wilion, the foreclosure buyer, and attorney's fees in connection to their dispute with Wilion.  Id.

Massachusetts law does not preclude recission even where restoration of the status quo is not feasible.  Levy v. Bendetson, 6 Mass. App. Ct. 558, 565 (1978) (ruling that recission of property sale was appropriate even though property had since been resold to another buyer where trial court could "exercise[e] its equitable powers to impose conditions on the grant of relief . . . and fashion a remedy which will be fair to [seller] in the circumstances").  This Court may tailor its award of equitable relief based on the facts of a given case.  See, e.g., Francis v. Pinault, No. CIV.A. C96-00625, 1997 WL 414970, at *5–6 (Mass. Super. July 18, 1997) (cancelling mortgage discharge but crediting defendant-mortgagor with $1800 in financing costs incurred to pay off loan and forgiving half the interest that would have accrued while discharge was recorded), vacated on other grounds, 50 Mass. App. Ct. 1109 (2000) (affirming trial judge's reasoning but vacating due to mathematical error); Bank of Mass. v. Cassin, No. 185782, 1994 WL 16193971, at *3 (Mass. Land Ct. Jan. 18, 1994) (granting equitable relief from mistaken discharge by restoring plaintiff to intended position as holder of first mortgage, except as to intervening lienholder who recorded its interest without notice of plaintiff's position).

26

Here, the Court's remedy returns Defendants to the position they would have occupied if the Discharge had not occurred.  Defendants' bases for arguing that their position is irreversibly changed relate to financial liability Defendants incurred while living at the Property.  See D. 110 at 20.  Prior to execution of the Discharge on October 3, 2012, however, Defendants were already in default on their loan and the Property had already been sold to Wilion.  D. 45-5 ¶¶ 14-16; 19; D. 117 ¶¶ 118, 120; see D. 31-1 at 99–100.  Moreover, the Discharge was not at issue in Pinti I as Defendants had not discovered it until after the SJC issued its ruling.  D. 45-3 ¶ 16; D. 112-1 ¶¶ 22–23.  Thus Defendants may be restored to their pre-Discharge position without accounting for payments related to Wilion or related to the state court litigation, as those expenses would have been incurred regardless of the Discharge.  D. 116 at 20.

As to attorneys' fees arising from this litigation and Pinti II, Defendant has not identified any case granting reimbursement of attorneys' fees expended defending against recission or striking a mistaken discharge.  Simply put, such litigation expenses do not appear necessary to restore Defendants to their pre-Discharge positions.  See Less v. Berkshire Hous. Ser., No. 00-30033-MAP, 2000 WL 1615740, at *7 (D. Mass. Sept. 8, 2000) (declining to shift attorney's fees in absence of bad faith in pursuing litigation).  Moreover, as Emigrant points out, D. 116 at 20, Defendants provide no documentation from which the Court can determine how much Defendants expended to defend the Discharge, rather than any of the numerous other disputes between the parties.

The Court understands Defendants' position regarding the condo fees and settlement to be that Defendants would not have agreed to pay such fees but for their belief that the Mortgage had been discharged.  While Defendants may have sought to avoid paying condo fees for a Property they anticipated being evicted from, Defendants do not explain why liability for such fees would

27

not have been incurred but for the Discharge.  As Emigrant points out, the litigation between Defendants and the condo association was initiated in January 2010, well before the Discharge was executed, over fees that likely predated the Discharge and which Defendants conceded were owed to the condo association.  D. 116 at 19–20 (citing D. 45-3 ¶ 27).  Fairness does not require the Court to credit Defendants for paying any amount that was already owed to the condo association prior to the Discharge.

Accordingly, the Court finds that Defendants have not shown they cannot be restored to their original positions and will enter a judgment striking the Discharge.

E.      **Defendants Adduced No Evidence of Fraud on the Court**

"A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."  Aoude v. Mobil Oil Corporation, 892 F.2d 1115, 1118 (1st Cir. 1989).  Defendants must surmount a "high bar" to obtain relief for fraud upon the court.  United States v. 6 Fox St., 480 F.3d 38, 46 (1st Cir. 2007).  "[T]he power of a court to set aside a judgment for fraud upon the court . . . [is a] traditional inherent power of a court to protect its own essential functioning and integrity.  It is, however, a power rarely to be used."  Simon v. Navon, 116 F.3d 1, 6 (1st Cir. 1997).  A finding of fraud upon the court "may be justified only by the most egregious misconduct directed to the court itself, and . . . it must be supported by clear, unequivocal and convincing evidence."  United States v. Yeje-Cabrera, 430 F.3d 1, 28 n.22 (1st Cir. 2005) (internal citation and quotation marks omitted).

Defendants assert that EMC perpetrated a fraud on the Court because (1) in Pinti I and Pinti II, EMC argued that it was the true holder of the Pinti Mortgage and had standing to foreclose,

28

despite knowing it was merely servicing that mortgage; (2) assignment of the discharged Pinti

Mortgage is fictitious; (3) EMC's litigation counsel falsely swore that EMC had standing to

foreclose in an affidavit filed in <u>Pinti II</u> and (4) EMC's in-house counsel manipulated or withheld

her client's corporate tax records.  D. 45-1 at 6–7.  First, to the extent that that EMC argued in

prior litigations that it had standing to strike the Discharge or foreclose on the Property,

"[c]hanging legal or factual positions in different cases . . . falls significantly short of committing

a fraud on the court."  <u>Lu v. Menino</u>, 98 F. Supp. 3d 85, 99 n.12 (D. Mass. 2015).  Moreover, EMC

never denied being the servicer of the loan in <u>Pinti II</u>.  Instead, EMC argued that, as the servicer,

it was authorized to act on behalf of Emigrant, the holder of the Pinti Note.  <u>Pinti II</u>, D. 12 at 7.

As to the Pinti Note and 2019 Pinti Mortgage assignments, Defendants offer no evidence of fraud

relating to the authenticity of these documents despite the opportunity to conduct discovery on

these issues.  Nor have Defendants ever introduced evidence showing the Emigrant or EMC (or

their counsel) manipulated or withheld their corporate tax records.  For all of these reasons,

Defendants have failed to adduce any evidence that would meet the high burden that is necessary

to establish that EMC, Emigrant or their attorneys have committed fraud on the Court.

> **F.** **<u>Defendants' Counterclaim for Violation of Chapter 93A Is Barred by the Statute of Limitations</u>**

In their counterclaim, Defendants allege that Emigrant engaged in unfair and deceptive

practices by repeatedly attempting to seize the Property and by sending fraudulent mailings,

including notices of Servicemembers Civil Relief Act in Massachusetts Land Court and notices of

intent to auction the Property in violation of Chapter 93A.  D. 20 at 10.  Nothing in Defendants'

supplemental opposition indicates that the Court should reconsider its prior conclusion that this

claim is time-barred.  D. 61 at 16.

29

Defendants' Chapter 93A counterclaim is governed by a four-year statute of limitations. Mass. Gen. L. c. 260, § 5A.  Under Massachusetts law, "[t]he limitations period begins to run 'when a [party] discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct.'"  Epstein v. C.R. Bard, Inc., 460 F.3d 183, 187 (1st Cir. 2006) (quoting Bowen v. Eli Lilly & Co., 408 Mass. 204, 205–06 (1990)).  Under the discovery rule, "the limitations period is tolled until 'events occur or facts surface which would cause a reasonably prudent person to become aware that she or he had been harmed.'"  Epstein, 460 F.3d at 187 (quoting Felton v. Labor Rels. Comm'n, 33 Mass. App. Ct. 926, 927 (1992)).  This discovery must include two components:  "not only knowledge that one has been injured but knowledge of its cause—that [the party] 'has been harmed as a result of the defendant's conduct.'"  Fidler v. Eastman Kodak Co., 714 F.2d 192, 198 (1st Cir. 1983) (quoting Olsen v. Bell Tel. Labs., Inc., 388 Mass. 171, 175 (1983)).

Here, Defendants reasonably knew as on August 9, 2012, the date of the attempted foreclosure sale, of the conduct that it alleges violates Chapter 93A.  D. 20 at 10; D. 45-5 ¶¶ 14–16.  Thus, Defendants' claim expired four years later, on August 9, 2016.  Defendants did not assert their claim for violations of Chapter 93A until May 18, 2020, see D. 20, thus the statute of limitations bars their claim.

Defendants argue that in equity it would be "unfair to allow [Emigrant] to delay in bringing the action, to prevent meritorious claims, that were held back because of the discharge."  D. 45-1 at 15.  The Court, however, does not conclude that Emigrant's claim was delayed unreasonably when it was brought within the requisite statute of limitations period.  See Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 679 (2014) (holding that laches cannot defeat a claim brought within the period prescribed by statute of limitations).  "An action for the recovery of land shall

commence . . . within twenty years after the right of action . . . first accrue[s]."  Mass. Gen. L. c. 260 § 21.  Defendants recorded the discharge of the Pinti Mortgage on July 29, 2015.  D. 45-5 ¶ 38.  Thus the statute of limitations for any claim regarding same by Emigrant expires twenty years from July 29, 2015.  Given that Emigrant brought its claim within the requisite statute of limitations, D. 1, the Court cannot conclude that Emigrant unreasonably delayed in bringing its action.

To the extent that Defendants argue that because Emigrant's claim has a longer statute of limitations period, the Court should equitably toll the statute of limitation for Defendants' Chapter 93A claims, they, again, do not cite any case law for this position.  Moreover, case law stresses that "equitable tolling is proper only when [a party] has in some extraordinary way . . . been prevented from asserting his or her rights."  Mosso v. Matesanz, No. 00-10199-GAO, 2001 WL 1688900, at *1 (Dec. 5, 2001) (internal citation and quotation marks omitted).  Defendants have not explained why any alleged delay on the part of Emigrant to file its claim prevented Defendants from bringing for their own Chapter 93A claim.  Indeed, the June 17, 2016 Pinti II complaint made clear that EMC intended to seek cancellation of the Discharge and yet Defendants did not raise their Chapter 93A claims until nearly four years later.  Pinti II, D. 1 ¶¶ 37–42.  Thus, the Court will not equitably toll the statute of limitations for Defendants' counterclaim and their Chapter 93A counterclaim is time barred.[2]

### G.      Defendants' Counterclaim for Negligent Infliction of Emotional Distress Fails

Defendants assert that Emigrant negligently inflicted emotional distress when it failed to have EMC "confirm that it had the authority to attempt to foreclose, and this negligence is the

---

[2] Given this ruling, the Court need not reach Emigrant's arguments on the merits or its argument that Defendants' Chapter 93A claim is barred by *res judicata*.  D. 29 at 11, 13-16.

direct cause of the harm suffered by Linda Pinti."  D. 20 at 11.  Emigrant asserts that this claim is barred by the doctrine of claim preclusion and fails on the merits.  D. 29 at 16–18. First,  a claim is precluded under the doctrine of *res judicata* if there is "(1) a final judgment on the merits in an earlier action; (2) sufficient identity between the causes of action asserted in the earlier and later suits; and (3) sufficient identity between the parties in the two suits." Bay State HMO Mgmt., 181 F.3d at 177.  Defendants previously asserted a negligent infliction of emotional distress claim in Pinti II premised on EMC's efforts to foreclose the Pinti Mortgage.  Pinti II, D. 31-1 ¶¶ 62–68. The Court in Pinti II, entered a final judgment on the merits of this claim when it granted summary judgment in favor of EMC.  Pinti II, D. 54 ¶ 3.  Second, there is sufficient identity between the causes of action asserted in Pinti II and the current case because both arise out of EMC's conduct in attempting to foreclose the Property.  Third, EMC and Emigrant share a sufficient identity because EMC is Emigrant's servicer.  See R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 185–86 (1st Cir. 2006).  Accordingly, EMC and Emigrant are sufficiently identical with regard to Pinti II and the present case, and Defendants' allegations of negligent infliction of emotional distress are barred.

Even if this claim was not barred by *res judicata*, it fails on the merits.  To succeed on their counterclaim for negligent infliction of emotional distress, Defendants must demonstrate that Emigrant owed them a duty of care.  See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 239 (1st Cir. 2013).  Mortgagor-mortgagee relationships, however, do not give rise to a duty of care. Id. at 239 & n.15 (citing Corcoran v. Saxon Mortg. Servs., Inc., No. 09–11468–NMG, 2010 WL 2106179, at *4 (D. Mass. May 24, 2010)); see MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 495 (1st Cir. 2013) (holding that "relationship between a borrower and lender does not give rise to a duty of care under Massachusetts law").

Accordingly, Emigrant is entitled to summary judgment on Defendants' counterclaim for negligent infliction of emotional distress.

### H.   Defendants' Counterclaim Intentional Infliction of Emotional Distress Claim Also Fails

Defendants also assert that Emigrant intentionally inflicted emotional distress by allowing EMC fraudulently to attempt to foreclose on the Property, despite knowing the effect the foreclosure would reasonably have on Pinti.  D. 20 at 11.  Unlike the claim for negligent infliction of emotional distress, Defendants previously did not assert this claim.  "[C]laim preclusion [however,] bars the relitigation of any issue that was, or *might have been*, raised in respect to subject matter of the prior litigation prior litigation."  Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994) (emphasis in original) (citations omitted).  Defendants' counterclaim for intentional infliction of emotional distress is premised on similar facts as its negligently infliction of emotional distress claim, namely EMC's conduct in attempting to foreclose on the Property.  This conduct occurred prior to Pinti II and thus Defendants were obligated to bring such a claim in Pinti II.  See Airframe Sys., Inc. v. Raytheon Co., 520 F. Supp. 2d 258, 267 (D. Mass. 2007) (ruling that claim preclusion wiped out liability based on any actions or conduct preceding the court's prior decision).

Even assuming, however, that Defendants' claim for intentional infliction of emotional distress is not precluded, it too fails on the merits.  Under Massachusetts law, a claimant must show the following for a claim of intentional infliction of emotional distress:  "(1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct . . . (2) the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress

33

suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." Payton v. Abbott Labs, 386 Mass. 540, 555 (1982). "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions or other trivialities[;] nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997) (citations and internal quotation marks omitted). "[W]hile home foreclosure is a terrible event and likely fraught with unique emotions and angst, foreclosures, even ones that may involve improper conduct, do not readily go beyond all possible bounds of decency." Asfour v. Citizens Bank, N.A., No. 16-11732-FDS, 2016 WL 7428224, at *6 (D. Mass. Dec. 23, 2016) (quoting Payton v. Wells Fargo Bank, N.A., 2013 WL 782601, at *4 (D. Mass. Feb. 28, 2013)).

Here, on this developed record, there is no support for an assertion that Emigrant or EMC acted intentionally to inflict emotional distress or knew or should have known that emotional distress would result. Accordingly, the Court also allows Emigrant's motion for summary judgment as to Defendants' counterclaim for intentional infliction of emotional distress.

## I.     Defendants' Defense of Laches

"A defense of laches exists upon a factual finding that there has been unjustified, unreasonable, and prejudicial delay in raising a claim." Santagate v. Tower, 64 Mass. App. Ct. 324, 333 (2005) (citation omitted). Defendants argue that there is a factual dispute as to why Emigrant waited "from 2012 to the filing of the instant case to assert their rights." D. 45-1 at 15. A defense of laches, however, cannot be invoked to bar legal relief in the face of a statute of limitations enacted by Congress. SCA Hygiene Products Aktiebolag v. First Quality Baby

Products, LLC, 580 U.S. 328, 334–35 (2017).  As discussed above, the statute of limitations for Emigrant's claim is twenty years from July 29, 2015.  That date has not yet passed.  Moreover, given Defendants' recording of the Discharge in 2015, the significant history of litigation between Defendants and Emigrant's affiliates and the Emigrant's filing of the present action after Pinti II, the Court does not find that there was any unreasonable delay in Emigrant's pursuit of its claims. Thus, the Court does not conclude as a matter of equity or otherwise that Emigrant's claim was delayed unreasonably.  See Petrella, 572 U.S. at 675-81 (holding that laches cannot defeat a claim brought within the period prescribed by statute of limitations).

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 28.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

ADD035

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____X

**Emigrant Residential, LLC**
                        **Plaintiff,**

**v.**                                    **Civil Action No.: 19-CV-12258-DJC**

**Linda S. Pinti, Lesley R. Phillips, and**
**Any and All Occupants,**
                        **Defendants.**
_____X

## JUDGMENT

**Casper, D.J.**

In accordance with the Memorandum and Order entered on December 18, 2023, ECF Dkt. No. 120, GRANTING Plaintiff's Motion for Summary Judgment;

It is hereby ORDERED, ADJUDGED AND DECREED THAT

1. Judgment shall enter this day in favor of the Plaintiff on Count I of the Complaint for a Declaratory Judgment striking a Discharge of the Mortgage given by the Defendants to Emigrant Mortgage Company, Inc. dated March 13, 2008, and recorded with the Middlesex County (Southern District) Registry of Deeds in Book 50930, Page 401 ("Mortgage") from title to the Property located at 1643 Cambridge Street, Unit 52, Cambridge, MA (the "Property");

2. The Discharge of Mortgage recorded on July 29, 2015, with the Middlesex County (Southern District) Registry of Deeds in Book 65810, Page 199 is hereby stricken from title to the Property;

3. Judgment shall enter this day in favor of the Plaintiff on Count I of the Defendants' counterclaims for Perpetrating Fraud on the Court;

ADD036

4.  Judgment shall enter this day in favor of the Plaintiff on Count II of the Defendants' counterclaims for Violations of G.L. c. 93A;

5.  Judgment shall enter this day in favor of the Plaintiff on Count III of the Defendants' counterclaims for Intentional Infliction of Emotional Distress;

6.  Judgment shall enter this day in favor of the Plaintiff on Count IV of the Defendants' counterclaims for Negligent Infliction of Emotional Distress;

By the Court,

Dated: March 29, 2024

Denise J. Casper
United States District Judge

ADD037

**CERTIFICATE OF SERVICE**

I, Eric E. Renner, hereby certify that on this 16th day of September, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the Court's appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

/s/ Eric E. Renner
Eric E. Renner